Bergan, J.
This appeal involves the right of police to stop a person in the public street and question him under circumstances that would reasonably actuate investigation and inquiry. An additional and rather separable legal question arises on the right of police to “frisk” the person being questioned as an incident to the inquiry.
The ‘ ‘ stop and frisk ’ ’ amendment to the Code of Criminal Procedure (L. 1964, ch. 86, eff. July 1, 1964) adding new section 180-a to the code does not apply to this case which turns on events which occurred in May, 1962. Although similar general principles underlie both the new statute and the validity of police action involved in this case, the prescribed standards of initial action and the grounds and scope of the invasion of the person questioned are somewhat different as laid down in the statute and as posed by the record before us.
The new statute, for example, authorizes the police to stop and question any person in a public place ‘ ‘ whom he reasonably suspects is committing, has committed or is about to commit ’ ’ a felony or certain misdemeanors; and if the policeman ‘ ‘ reasonably suspects ” he himself is in danger he “may search such person for a dangerous weapon ” (Code Crim. Pro., § 180-a).
The case now presented does not precisely turn on these standards and, of course, neither the action of the police nor the proof in the judicial proceeding under review was directed toward compliance with a statute not then enacted.
The facts before us are these: On May 25, 1962 at 1:30 in the morning, Detective Bennett and two other detectives were on motor patrol near 7th Street and Avenue C in Manhattan. All were in plain clothes; the car was unmarked. Detective Bennett *444 observed two men for about five minutes. They ‘‘ walked up in front, outside a bar and grill, stopped, looked in the window, continued to walk a few steps, came back, and looked in the window again ”.
The detective further testified: “ At that time the defendant looked in my direction, towards the car, said something to his friend, and they both started walking rapidly north on Avenue 0.” He described the area as a neighborhood in which “ We have quite a bit of crime * * * Muggings, stick-ups, assaults, larcenies, burglaries ”. After defendant and his companion started walking rapidly the detective got out of the car and said “ Hold it. This is the police.” He continued: “ And I approached the defendant, and I patted—for my own protection I patted the outside of his clothing. ’ ’ The statement, ‘ ‘ for my own protection ” was stricken, but it was later allowed in the record over objection.
The witness continued: “I frisked the defendant’s outside clothing and in the rear I felt a hard object that felt * * * like a weapon or gun * * * I removed a .22' caliber gun fully loaded.”
Defendant was thereupon arrested and indicted for criminally carrying a loaded pistol and for criminally possessing a pistol. A motion to suppress the evidence thus seized, including some bullets, was granted by the Supreme Court (38 Misc 2d 586). The Judge was of opinion he was required to do this by prior decisions of this court, notably People v. Chiagles (237 N. Y. 193 [1923]), People v. Loria (10 N Y 2d 368 [1961]), People v. O’Neill (11 N Y 2d 148 [1962]), and People v. Caliente (12 N Y 2d 89 [1962]). The Appellate Division affirmed unanimously without opinion (19 A D 2d 863).
The first problem is the authority of the police in the circumstances shown here to stop and question defendant. The validity of subsequent police action would in turn necessarily rest on the initial right to make the immediate and summary street inquiry.
The authority of the police to stop defendant and question Tiim in the circumstances shown is perfectly clear. The business of the police is to prevent crime if they can. Prompt inquiry into suspicious or unusual street action is an indispensable police power in the orderly government of large urban communities. It is a prime function of city police to be alert to things *445 going wrong in the streets; if they were to be denied the right of such summary inquiry, a normal power and a necessary duty would be closed off.
And the evidence needed to make the inquiry is not of the same degree or conclusiveness as that required for an arrest. The stopping of the individual to inquire is not an arrest and the ground upon which the police may make the inquiry may be less incriminating than the ground for an arrest for a crime known to have been committed. It is enough for the purposes of this case to rule that the police were justified in the record as here developed in stopping and in questioning defendant.
Such a power and duty in the police to question a person as an incident to investigation seems to have been taken to be valid by this court almost as a matter of course in People v. Marendi (213 N. Y. 600, 609). In deciding the validity of the detention of a person by Federal officers for a period to determine whether or not an arrest should be made, Marendi was cited by Lumbard, Ch. J., as an example of a detention for inquiry not amounting to an arrest sanctioned in New York (United States v. Vita, 294 F. 2d 524, 530 [2d Cir., 1961]). In a somewhat similar direction is United States v. Bonanno (180 F. Supp. 71, 81-83), which, although reversed on other grounds sub nom. United States v. Bufalino (285 F. 2d 408, 410), was cited on this point with approval in Vita at page 530.
The validity of the initial stopping and inquiry by police under suspicious circumstances is implicit, too, in the recent decision of this court (People v. Entrialgo, 14 N Y 2d 733), where police inquiry was a necessary prelude to the development of the criminal case there considered.
Therefore, the facts developed in the record, e.g., the incidence of crime in the neighborhood, the peculiar approaches of defendant and his companion to the grill, the rapid leaving when the police were seen (even in plain clothes three men in a car watching could reasonably give alarm to a person alert to detection), all justified the police stopping defendant and questioning him.
Indeed, the right of the police to stop and question the defendant in such circumstances as those disclosed by this record was recognized at common law. It is extensively treated both by statute and by judicial decision as a reasonable and necessary *446 police authority for the prevention of crime and the preservation of public order (2 Hawkins, Pleas of the Crown 122, 129 [6th ed., 1777]; 2 Hale, Pleas of the Crown 89, 96-97 [Amer. ed., 1847]; Lawrence v. Hedger, 3 Taunt. 14, 128 Eng. Rep. 6 [Common Pleas, 1810]; General Laws of B. I. [1956], tit. 12, ch. 7, § 12-7-1; Delaware Code Ann., tit. 11, § 1902; N. H. Rev. Laws, ch. 423, § 21 [1942]; Mass. Gen. Laws Ann., ch. 41, § 98 ; State v. Hatfield, 112 W. Va. 424 [1932]; City of Portland v. Goodwin, 187 Ore. 409 [1949]; Hargas v. State, 58 Okla. Or. 301 [1935]; Gisske v. Sanders, 9 Cal. App. 13 [1908]; People v. Jackson, 164 Cal. App. 2d 759 [1958]).
If we recognize the authority of the police to stop a person and inquire concerning unusual street events we are required to recognize the hazards involved in this kind of public duty. The answer to the question propounded by the policeman may be a bullet; in any case the exposure to danger could be very great. We think the frisk is a reasonable and constitutionally permissible precaution to minimize that danger. We ought not, in deciding what is reasonable, close our eyes to the actualities of street dangers in performing this kind of public duty.
A good argument is advanced by defendant that the exterior touching is a “search” in the full meaning of that term and carries against its validity all of the weight of judicial interdiction (People v. Loria and People v. O’Neill, supra). The frisk as it is described in the actual events that occurred in this case, however, and as it is generally understood in police usage, is a contact or patting of the outer clothing of a person to detect by the sense of touch if a concealed weapon is being carried.
It is something of an invasion of privacy; but so is the stopping of the person on the street in the first place something of an invasion of privacy. The frisk is less such invasion in degree than an initial full search of the person would be. It ought to be distinguishable also on pragmatic grounds from the degree of constitutional protection that would surround a full-blown search of the person.
That kind of search would usually require sufficient evidence of a committed crime to justify an arrest or be an incident to a lawful arrest (Harris v. United States, 331 U. S. 145 [1947]). *447 In the end, as in most close issues of public policy, a court is called upon to strike a fair balance of competing interests.
And as the right to stop and inquire is to be justified for a cause less conclusive than that which would sustain an arrest, so the right to frisk may be justified as an incident to inquiry upon grounds of elemental safety and precaution which might not initially sustain a search. Ultimately the validity of the frisk narrows down to whether there is or is not a right by the police to touch the person questioned. The sense of exterior touch here involved is not very far different from the sense of sight or hearing—senses upon which police customarily act.
The fact that the police detective actually found a gun in defendant’s possession is neither decisive nor material to the constitutional point in issue. The question is not Avhat was ultimately found, but whether there was a right to find anything.
From the time the policeman, in the process of frisking defendant, touched the object, inferred by him correctly to be a gun, there was probable cause to arrest defendant and to proceed at once further to invade his clothing and take the gun.
The constitutional restriction is against unreasonable searches, not against all searches. And what is reasonable always involves a balancing of interests: here the security of the public order and the lives of the police are to be weighed against a minor inconvenience and petty indignity. A similar police procedure has long been sustained in California (People v. Martin, 46 Cal. 2d 106 [1956]).
The development of statutory implementation in the similarly grounded “ stop and frisk” statute has had some impressive acceptance in professional discussion (Kuh, Richard H., New York’s “Stop and Frisk” Law, N. Y. L. J., May 29, 1964, p. 4, col. 1; Siegel, William I., The New York “Frisk” and “ Knock-Not ” Statutes: Are They Constitutional?, 30 Brooklyn L. Rev. 274; Warner, The Uniform Arrest Act, 28 Va. L. Rev. 315, 317-324), although there are dissenting views (e.g., The “ No-Knock ” and “ Stop and Frisk” Provisions of the New York Code of Criminal Procedure, 38 St. John’s L. Rev. 392, 398-405). See, also, in a direction favorable to such police action Specter, Arlen, Mapp v. Ohio: Pandora’s Problems for the Prosecutor, under section “Routine” Person Stops (111 U. of Pa. L. Rev. 4,19).
*448 There are some interesting parallels in the actions of Federal authorities in searching the defendant in Abel v. United States (362 U. S. 217) during his administrative detention and the use of the evidence thus discovered in the subsequent criminal action. The conviction was affirmed. (See 30 U. of Cin. L. Rev. 229-232; also 349, The Power of Incidental Search; 74 Harv. L. Rev. 155; 59 Mich. L. Rev. 310.)
A State is not precluded from “ developing workable rules ” governing searches to meet ‘‘ ‘ the practical demands of effective criminal investigation and law enforcement ’ ” if the State does not violate the constitutional standard of what is reasonable (Ker v. California, 374 U. S. 23, 34).
The precautionary procedures followed by police in questioning this defendant are within the standard thus established by the Supreme Court. They meet the * ‘ practical demands of effective criminal investigation ”. And in our view the steps taken here were not unreasonable.
The order should be reversed and the motion to suppress denied.