UNITED STATES of America,
Appellee,

v.

William OWENS, Appellant.

No. 72–1280.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 16, 1972.

Decided Jan. 29, 1973.

Rehearing and Rehearing En Banc
Denied Feb. 26, 1973.

Gary A. Eberhardt, St. Louis, Mo., for appellant.

David W. Harlan, Asst. U. S. Atty., St. Louis, Mo., for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, LAY, Circuit Judge, and DURFEE, Senior Judge of the United States Court of Claims.*

DURFEE, Senior Judge of the United States Court of Claims.

This is an appeal by defendant, William Owens, from a final judgment of conviction in the United States District Court for the Eastern District of Missouri, Eastern Division, entered upon a jury verdict. The information charged unlawful possession of a United States Treasury check in the sum of $116.90, in violation of 18 U.S.C. § 1708 entitled, "Theft or receipt of stolen mail matter generally."

Prior to the jury trial, defendant filed two successive motions to suppress as evidence the stolen Treasury checks which the police had taken from defendant. Defendant alleged that this "seizure" was in contravention of his right to freedom from unreasonable searches and seizure, under the Fourth Amendment.

A hearing was held on defendant's first motion to suppress evidence, at which three police officers and defendant testified. The evidence was summarized by the trial court in a memorandum in which the trial court stated that the initial issue was the credibility of the witnesses. Because of the importance of this issue and the facts involved, the trial court's two memoranda of the evidence and its findings are included herein, as follows:

The testimony of the three police officers was consistent and can be summarized as follows. On November 3, 1971, at approximately 11:30 A.M., Detective Loehr and Officers Karpal and Zink were dressed in civilian clothes and cruising in an unmarked police car in the vicinity of Clara and Waterman Streets. The police officers observed an automobile in front of them (both vehicles were moving) and the defendant, who was seated on the front passenger seat, kept looking back at the police car. The police officers knew and recognized the defendant as a police character and believed the defendant recognized them as police officers. The two vehicles stopped at stop signs one block apart. The police officers turned at the stop sign onto Waterman Street and drove very slowly on Waterman to observe a house at 5510 Waterman which was known by the police officers to be a place where there was traffic in narcotics.

As they approached 5510 Waterman, they observed the automobile in which defendant was a passenger approaching from the opposite direction. That automobile parked at the curb across the street from 5510 Waterman; defendant alighted and walked across the street toward 5510 Waterman. At that time the unmarked police car stopped in the driving lane (not at the curb) in front of 5510 Waterman and defendant walked in front of the police car onto the sidewalk.

The defendant recognized Detective Loehr and quickened his pace. As defendant reached the sidewalk, with his back toward the police officers, at a distance of fifteen feet from them, he removed two brown envelopes from his left coat pocket and raised them to his front chest area where they were out of the police officer's view.

The officers testified that they observed that the envelopes were the same size and type used by the government to mail checks; and they observed a window in one envelope with a blue field showing through, which is similar to Treasury checks.

Two of the officers alighted and said, "Hold it, Owens, police officers." Defendant stopped. Detective Loehr said, "Whose checks are those?" Defendant took the envelopes out of his right inside coat pocket and handed them to Officer Karpal, and told the

* Senior Judge James R. Durfee of the United States Court of Claims is sitting by designation.

officers they were his mother's and his brother's. The names on the checks were Elnora Bass and Thelma Bass. Detective Loehr asked defendant to identify his "mother's" address. Defendant gave an address different from that on either check. At that time the police officers told Owens he was under arrest.

The defendant testified that he recognized the unmarked police car and Detective Loehr. He further testified that as he walked toward 5510 Waterman the police officers yelled, "Hold it, Owens," and knowing them to be policemen, he stopped. Defendant testified that at that point he did not feel he was free to go. Detective Loehr and Officer Karpal approached him and Officer Karpal reached to defendant's inside coat pocket and took the checks from him. Subsequently, Detective Loehr searched his other pockets.

There is no dispute that the police officers had no arrest warrant. The government has conceded that if defendant's testimony is believed, the search and seizure of defendant were unconstitutional.

The trial court resolved the issue of credibility of the witnesses against defendant, as follows:

* * * Defendant's demeanor and his response to questions indicated that defendant generally had vague, if any, recollections about the events leading to his arrest. In addition, defendant failed to call Lorenzo Perry as a witness. Defendant testified that Perry was within four feet of him throughout the alleged illegal search. Any testimony to corroborate defendant's testimony would have greatly aided the Court in this matter. The police officers testified that Perry was across the street at the parked car during the questioning. The unexplained failure of Perry to testify supports the inference that he was not where defendant said he was and/or

he cannot substantiate defendant's testimony.

Following a denial of defendant's motion to suppress evidence, defendant was granted leave to produce supplemental evidence, which was summarized by the trial court as follows:

Mrs. Dorothy Owens, wife of the defendant, testified that on November 3, 1971, she was living separate and apart from her husband, and resided with her five year old daughter at 5554 Waterman. She testified that at the time of the events in question she observed the defendant from the window of her apartment located on the second floor, front side of the building at 5554 Waterman. She observed the defendant as he was knocking at the door, calling her name. The door to the building is recessed and is kept locked for security purposes. Defendant did not have a key. She stated that she observed three policemen in plain clothes around her husband and an unmarked police car parked at the curb in front of the building, and that there were more policemen there. Mrs. Owens testified that there was a "commotion" going on. Mrs. Owens further testified that she saw Mr. Lorenzo Perry across the street at his car which was parked there. Mrs. Owens stated that she did not see defendant before he reached the door and that she observed the scene approximately two minutes.

Mr. Lorenzo Perry testified that on November 3, 1971, he was with the defendant; that he drove the defendant to 5554 Waterman where Mrs. Owens lives; that he and defendant got out of the car and walked across the street together; that as they approached the door of 5554 Waterman, the police yelled, "Halt" or "Stop." Perry testified that he and the defendant were then at the door of 5554 Waterman and the policemen were then on the sidewalk approximately 20 to 30 feet from them. Perry stated that he and the defendant turned

around and three, white, policemen identified themselves; and two of them approached defendant and one of them approached him. Perry stated that a policeman asked them a question to the effect of "Do you have anything on you?" The police officers then searched Perry and the defendant. Perry testified that he was standing four to five feet from the defendant the entire time, and that at no time did defendant hand anything to the police. Perry testified that the police removed the envelopes from defendant's coat pocket during their search of him.

Perry's testimony that he was four to five feet from the defendant during the "search" is at odds with Mrs. Owens' testimony that she observed him across the street while the three policemen were with Owens. The police officers also testified that Perry was across the street the whole time. While the defendant testified that Perry was near him during the search, their testimony is otherwise inconsistent. Perry said the officers identified themselves, the defendant said they did not. Perry said the police asked if they had anything on them; and defendant said they asked where he got the checks. Perry said they were at the door of 5554 Waterman when the police halted them; the defendant said they were approaching the apartment when stopped. As a whole Perry's testimony is incredible.

Mrs. Owens' testimony adds nothing as far as the alleged search is concerned. She did not observe any search or hear anything concerned therewith. The value of her testimony is that she has given a reason for defendant to be in that location at that time, that time, that is, that defendant was to visit her at 5554 Waterman. The Court finds the value of that testimony to be greatly diminished inasmuch as defendant did not corroborate any part of it when he was testifying. At no time did de-

fendant state why he was in the middle of the 5500 block of Waterman. And yet he testified after the police had testified that they were suspicious because defendant was approaching an address (5510 Waterman) known to be involved in narcotics traffic. In fact, at the original hearing (p. 85 of the transcript), the Court asked the defendant the following question:

"Mr. Owens, as I understand your testimony, you got out of your car; walked up towards 5510; and somebody hollered, 'Hold it.'?"

In response, the defendant said, "Yes."

The Court concludes that the additional, supplemental evidence, when considered with the evidence at the original hearing does not compel a different conclusion from that reached by this Court in its Memorandum and Order filed January 18, 1972. Accordingly, said Memorandum and Order denying the defendant's motion to suppress evidence stands, as supplemented by this Memorandum.

■ The Court resolved the issue of credibility against defendant. We hold that the issue of credibility was properly determined by the Court which heard and observed the witnesses before it. We further hold that the factual findings of the trial court in its two memoranda, are supported by substantial evidence.

The trial court then concluded in its memoranda that Owens was not forcibly detained or "arrested" by the police officers when they said, "Hold it, Owens, police officers."; that the police officers acted lawfully in detaining Owens briefly for a limited inquiry concerning the mail matter; and that no "search and seizure" occurred when Owens handed the check to Officer Karpal.

Defendant's motions to suppress were overruled by the trial court, which then admitted the check in evidence at the trial over defendant's objections. De-

fendant assigns error to these rulings by the trial court on the grounds that:

William Owens, the defendant, was unlawfully arrested by police officers prior to their obtaining the said Treasury check from defendant and the evidence thereafter obtained should be held inadmissible as the "fruit" of an unauthorized arrest.

Even if defendant was not "arrested" when he was stopped by the police prior to the seizure of the U.S. Treasury check, "pressures" resulting from the police detention of this defendant made the alleged "handing over" of the check to the police officers involuntary or non-consensual.

Having determined that the factual findings by the trial court, based upon its resolution of the issue of credibility of the witnesses are supported by substantial evidence, we conclude that the denial of defendant's motion to suppress by the court was correct.

■ In Carpenter v. Sigler, 419 F.2d 169 (8th Cir. 1969), defendant Carpenter was denied a petition for habeas corpus by a United States District Court, following Carpenter's conviction and sentence by a state court for burglary. Carpenter contended that certain burglary tools were improperly received in evidence at his trial because they were obtained as a result of an unlawful search and seizure in violation of his Fourteenth Amendment rights. This court held that the evidentiary findings upon which the District Court based its dismissal order were supported by substantial evidence, and that the decision was not induced by any erroneous view of the law, and affirmed the District Court's denial of the petition for habeas corpus.

The Court cited the rule in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1967), defining the Fourth Amendment term "seized" for the purpose of police citizen street encounters that:

"It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."

The court in Carpenter, supra, found that Carpenter was "seized" when the police officers signaled him to pull to the curb by the use of their flashing red light. Likewise, we find here that when the three officers commanded defendant to "Hold it, Owens, police officers," and restrained his freedom to walk away, he was "seized" by them under the rule in Terry and Carpenter, supra, even though the trial court here concluded that Owens was not "forcibly detained or arrested."

■ In Carpenter, supra, the court then turned to the question as to whether the "seizure" was "reasonable" under the Fourteenth Amendment. It found that the police officers were "reasonable" in the initial "seizure" of Carpenter, under certain facts which "point to a sufficient justification for stopping the Carpenter auto and requiring the occupants to identify themselves." The suspicions of Owens by the officers were first aroused from their recognition of him at 11:30 A.M., as a person known to have a police record, his continued watching of them from the automobile ahead of theirs, his stopping and alighting from the automobile at the front of a place known by the officers to be a place where there was traffic in narcotics, the quickening of his pace when he recognized the officers as he passed in front of their car, and his general behavior. The most significant and suspicious circumstance then occurred when they saw defendant at a distance of fifteen feet remove two brown envelopes from his left coat pocket, which they correctly recognized as closely resembling the envelopes used by the Government to mail Government checks. Owens then raised the envelopes to his chest where they were out of the officers' view. Under the decision in Terry, supra, we can rationally infer that the facts warranted the intrusion on Owens' Fourth Amendment rights, and that the scope of the intrusion was reasonably

related "to the circumstances which justified the interference in the first place."

The Supreme Court in *Terry* cited with approval the statement in People v. Rivera, 14 N.Y.2d 441, 252 N.Y.S.2d 458, 201 N.E.2d 32 (1964), cert. denied, 379 U.S. 978, 85 S.Ct. 639, 13 L.Ed.2d 568 (1965):

> The evidence needed to make the inquiry is not of the same degree of conclusiveness as that required for an arrest. The stopping of the individual to inquire is not an arrest and the ground upon which the police may make the inquiry may be less incriminating than the ground for an arrest for a crime known to have been committed.

We are of the opinion that the unusual, suspicious and significant actions of Owens, as observed by the officers, were sufficient justification to stop him and ask: "Whose checks are those?"

█ Under *Terry*, the manner in which the search was conducted, as well as the seizure is "as vital a part of the inquiry as whether they were warranted at all." Here there was no actual physical search. As found by the trial court, after the officers asked Owens, "Whose checks are those?", he voluntarily, without protest or further inquiry, took the envelopes out of his pocket and handed them to Officer Karpal, and then falsely represented that the Government checks inside were his mother's and his brother's. It was not until the officers determined the falsity of this statement that they told Owens he was under arrest. These facts fail to establish pressures resulting from the police detention which made the handing over of the checks involuntary or non-consensual, as alleged by defendant. In any event, the scope of such "search and seizure" was reasonably related to the circumstances

which justified the interference in the first place, as required in *Terry, supra*.

Accordingly, we find that the trial court did not err in overruling defendant's motion to suppress the evidence, and in admitting said checks in evidence at the trial over defendant's objection.

█ We further find that the court below did not err in overruling defendant's objection to the introduction of the second United States Government check in Owens' possession into evidence, the unlawful possession of which was not charged in the information against defendant. Both checks were prepared and mailed at the same time to the same address as monthly Social Security benefits. Possession of the second check by Owens was closely connected with the offense charged, and tends to prove intent. United States v. Gray, 464 F.2d 632 (8th Cir. 1972); United States v. Crawford, 438 F.2d 441 (8th Cir. 1971). The reception of the second check as evidence for this limited purpose was clearly proper.

█ Defendant further asserts as error the refusal by the trial court to substitute instruction number 7a as offered by defendant in lieu of instruction numbered 7. Defendant asserts that the given instruction[1] suggests that the Government need not prove that the mail matter was stolen from the United States, and that the court should have added to the instruction. "However, this does not relieve the Government of proving beyond a reasonable doubt that the check was stolen from the United States mail, and that defendant had knowledge that the check was stolen."

Defendant raises the same objection to Instruction Number 11 which was an explanation of the inferences to be drawn from the possession of stolen property. Defendant argues that although Instruction Number 5 did correctly state that the Government must

---

1. Instruction 7—If the Government proved the defendant knew the check was stolen, it is not necessary to prove that he knew the same was stolen from the mail for one who knowingly possesses a stolen chattel does so at the peril that it may have been stolen from the United States mail.

prove the check to be stolen from the mail, "the subsequent instructions involving proof that the checks were stolen and knowledge that they were stolen tended to confuse or minimize the importance of proving they were stolen from the mail." However, the court clearly stated this requirement of proof upon the Government in at least four other instances: (1) in the charge under the information, (2) in a quotation from the statute under which the information was drawn, (3) in its statement of the three essential elements of proof to establish the offense charged, and (4) the statement of the Government's position as to the elements of the crime. The jury must have clearly understood from these repeated instructions that the burden was on the Government to prove that the checks had been stolen from the mail in order to find defendant guilty as charged, and any further repetition of this point would be needless.

The judgment of conviction of defendant by the trial court is affirmed.

LAY, Circuit Judge (dissenting).

I respectfully dissent. This is a significant case. In balance is the individual's right to privacy as weighed against society's interest in having lawful police protection.

First, it should be emphasized what this case is not about. This case does not involve interrogation by police when they are investigating a specific crime which has been committed. Cf. Orricer v. Erickson, 471 F.2d 1204 (8 Cir. 1973); Klingler v. United States, 409 F.2d 299 (8 Cir. 1969), cert. denied, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110. Nor does this case involve an investigation of activities in an area where previous crimes were known to have been committed. Cf. United States v. Wickizer, 465 F.2d 1154 (8 Cir. 1972); Carpenter v. Sigler, 419 F.2d 169 (8 Cir. 1969).

In Terry v. Ohio, 392 U.S. 1, 11, 88 S.Ct. 1868, 1874, 20 L.Ed.2d 889 (1968), the Supreme Court gave tacit approval to the argument that within "[t]he heart of the Fourth Amendment . . .

is a severe requirement of specific justification for any intrusion upon protected personal security . . . ." The Court in *Terry* further recognized that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Id. at 16, 88 S.Ct. at 1877. In the present case, there can be little doubt that Owens was effectively "seized" when the officers commanded, "Hold it, Owens, police officers. Whose checks are those?" It is equally clear that this constituted a formal detention specifically directed at discovering the ownership of something Owens then possessed.

When the police seize a person the question then becomes whether the facts warranted the intrusion on the individual's Fourth Amendment rights. Terry v. Ohio, 392 U.S. at 20, 88 S.Ct. 1868; United States v. Wickizer, 465 F.2d at 1156; Carpenter v. Sigler, 419 F.2d at 171. In order to justify the intrusion the officers must be able to recite "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. at 21, 88 S.Ct. at 1880. The standard, as articulated by the Supreme Court, is whether the facts available to the officer at the moment of the seizure would warrant a person of reasonable caution to believe that the action taken was appropriate. Terry v. Ohio, 392 U.S. at 21–22, 88 S.Ct. 1868.

The information and facts available to the officers here do not rise to the level of suspicion that could reasonably justify a restraint upon Owens' liberty. The three officers at the moment of seizure recognized Owens as a police character and knew that he had looked back at them several times while riding in a car; that after he stepped out of the car he walked along a street where a house known for narcotics traffic existed; that he quickened his pace when he saw them; and that he removed from his pocket two brown envelopes similar in

size, shape and color as those used for government checks.[1]

The police had no knowledge that a crime had been or was being committed. The inference that a person who walks along a street near a house used for illicit narcotic activity and who removes two envelopes from one pocket and places them in another is engaged in criminal activity is simply not the kind of reasonable inference required to support an intrusion upon that person's personal security. Compare Sibron v. New York, 392 U.S. 40, 62, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); United States v. Nicholas, 448 F.2d 622 (8 Cir. 1971); Riccardi v. Perini, 417 F.2d 645, 647 (6 Cir. 1969). Assuming the envelopes could be identified from a distance as government checks, the possession of such checks is not unlawful per se and such possession should not give rise to any suspicion of illegal activity. From the meager facts known by the police, it is obvious that the officers stopped Owens only upon a "hunch", and such unparticularized suspicion should not and cannot be the basis of a seizure. See Terry v. Ohio, 392 U.S. at 27, 88 S.Ct. 1868, 20 L.Ed.2d 889.

*Terry* also teaches that even if the initial intrusion is permissible, any further intrusion must be reasonably related "to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. at 20, 88 S.Ct. at 1879; United States v. Wickizer, 465 F.2d at 1156; Carpenter v. Sigler, 419 F.2d at 171. The discovery here of the checks' identity was related to the officers' reason for stopping Owens; however, what actually became necessary was the disclosure of the contents of Owens' pocket. This intrusion is not sanctioned by the *Terry* decision. The purpose of the limited search permitted in *Terry* was not to discover evidence of a crime, but to allow police officers to make a narrowly drawn search for weapons for their own protection. Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). A physical search of Owens' pockets for government checks would have been impermissible. Similarly, a verbal charge by a police officer, such as "Whose checks are those?", which results in a suspect's acquiescence to the police command (requiring the disclosure of the contents of one's pocket) is just as impermissible.

This case would not be here if Owens did not have wrongful possession of the checks. Many persons will easily justify the police conduct on the basis of what the illegal intrusion produced. However, the law is not as shortsighted as to condone police illegality by the end result. Bumper v. North Carolina, 391 U.S. 543, 548 n. 10, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). To give sanction to the police conduct here goes beyond any existing case law of which I am aware. We now cast the balance against the interest of the individual to be reasonably free from police harassment and seizure. The privacy of the individual is intended to be more sacrosanct under our Constitution. Some may urge that the intrusion by the police in this case is trivial and constituted only "a minor indignity;" however, when innocent conduct can be so easily subjected to police surveillance followed by a detentive intrusion, then we place every innocent indi-

1. The alleged furtive movements established nothing. As the California Supreme Court observed in People v. Superior Court of Yolo County, 3 Cal.3d 807, 91 Cal.Rptr. 729, 735, 478 P.2d 449, 455 (1970):

"The difficulty is that from the viewpoint of the *observer*, an innocent gesture can often be mistaken for a guilty movement. He must not only perceive the gesture accurately, he must also interpret it in accordance with the actor's true intent. But if words are not infrequently ambiguous, gestures are even more so. Many are wholly nonspecific, and can be assigned a meaning only in their context. Yet the observer may view that context quite otherwise from the actor: not only is his vantage point different, he may even have approached the scene with a preconceived notion—consciously or subconsciously—of what gestures he expected to see and what he expected them to mean. The potential for misunderstanding in such a situation is obvious."

vidual at the mercy of the authoritarian state.[2]

Today's emotional concern surrounding entrance into a federal building, border searches and fear of airplane hijacking has subjected the American public to sometimes strained invasions of our individual freedom. We as a "free" people should hold fast to one of the few remaining vestiges of privacy the individual enjoys [3]—the right to use the public street without undue fear of police surveillance, harassment and detention.

2. By our decision today, we thus give sanction to police surveillance in minority housing areas where only further friction can result. As pointed out in Terry v. Ohio, 392 U.S. at 14 n. 11, 88 S.Ct. at 1876:

"The President's Commission on Law Enforcement and Administration of Justice found that '[i]n many communities, field interrogations are a major source of friction between the police and minority groups.' President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police 183 (1967). It was reported that the friction caused by '[m]isuse of field interrogations' increases 'as more police departments adopt "agressive patrol" in which officers are encouraged routinely to stop and question persons on the street who are unknown to them, who are suspicious, or whose purpose for being abroad is not readily evident.' Id., at 184. While the frequency with which 'frisking' forms a part of field interrogation practice varies tremendously with the locale, the objective of the interrogation, and the particular officer, see Tiffany, McIntyre & Rotenberg, supra, n. 9, at 47–48, it cannot help but be a severely exacerbating factor in police-community tensions. This is particularly true in situations where the 'stop and frisk' of youths or minority group members if 'motivated by the officers' perceived need to maintain the power image of the beat officer, an aim sometimes accomplished by humiliating anyone who attempts to undermine police control of the streets.' Ibid."

3. See Westin, Privacy & Freedom (1967).