STATE OF CONNECTICUT *v.* JOSEPH D. WATSON

STATE OF CONNECTICUT *v.* GEORGE J. STROMAN

STATE OF CONNECTICUT *v.* CHARLES CARTER

STATE OF CONNECTICUT *v.* CHARLES EVANS

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

578

*(One judge dissenting)*

Argued October 4—decided December 19, 1973

*Edward F. Hennessey,* special public defender, for the appellants (defendants).

*Richard F. Banbury,* assistant state's attorney, with whom, on the brief, was *John D. LaBelle,* state's attorney, for the appellee (state).

Loiselle, J. The four defendants were tried and convicted by a jury on all counts of three-count informations charging each with robbery with violence in violation of General Statutes § 53-14; binding with intent to rob in violation of § 53-19; and possession of an unlicensed weapon in a motor vehicle in violation of § 29-38. The defendants have appealed, and their appeals were consolidated by leave of court.

The assignments of error are so interrelated that the issues presented by the appeal will be discussed as they were presented in the brief of the defendants.

In a preliminary hearing, the court ruled against the motion to suppress filed by the four defendants. This ruling was assigned as error and the court found the following facts with respect to it: On the night of June 25, 1970, Detective Anthony Albuquerque of the Windsor police department parked his unmarked vehicle in the parking lot of Carville's Restaurant for general surveillance purposes. South of the restaurant's main entrance is a take-out restaurant called the Ranch House, and southwest of the Ranch House is Carville's Motel. From where he was parked, Albuquerque's view included the southeast wing of the motel, the motel office and entrance, 90 percent of the motel rooms facing east, the cocktail lounge, the steak house, and the rear entrance of the property. Shortly after 11:30 p.m. he observed a white Rambler automobile enter the driveway of Carville's Motel and proceed in a westerly direction, passing within four feet of his vehicle. Albuquerque noted the registration number before the car stopped behind the Ranch House. After four persons got out of the Rambler, Albuquerque's at-

tention was distracted by another driver's request for directions. When he looked back at the Rambler, he watched the car drive past his vehicle to a point near the entranceway from route 159 at the end of the parking lot. He checked the Ranch House but it had recently closed and only the employees were present, working. He then returned to his vehicle to check on the night clerk. Up to that point, his investigation had revealed nothing unusual. As he proceeded southwesterly in the parking lot toward the southeasterly wing of the motel, his headlights picked up four men walking hurriedly and cautiously, apparently from the rear of the motel. Before the Rambler left the lot with its five occupants, he radioed a marked police car to stop it. At this point, Albuquerque had a suspicion that they had committed, were committing, or were about to commit a crime.

Officer John Witkins of the Windsor police department received Albuquerque's call and stopped the Rambler on Windsor Street, about 500 feet south of the motel. There was a great deal of commotion in the Rambler as Witkins approached the vehicle. The occupants were twisting, turning and bending, and the defendant Evans, alias Moore, had bent down and then popped up again, looking out of the rearview window. Witkins approached the driver and asked him for his license and registration. The driver responded with foul language, and Witkins momentarily backed away. Albuquerque arrived at that time and took charge. He also saw Evans bend down toward the floor. As Witkins was having trouble obtaining the license and registration of the driver, Albuquerque asked the men to get out of the car. Sergeant Frank Andrusko arrived in a cruiser at about this time. The occu-

pants of the Rambler exited from their vehicle. As three of the defendants exited from the rear seat, two credit cards fell on the car's doorsill. As he saw these cards, a shiny object partly under the front seat also caught Albuquerque's eye. He extended his head inside the car and saw that the shiny object was a watch, but did not disturb it. The defendants continued their verbal assault and rather than standing still as requested were shifting around, trying to circle behind the officers. Albuquerque asked the men what they were doing behind the motel and they denied being there. He then asked who owned the credit cards but no one answered. Since Albuquerque was standing two or three feet from the credit cards on the doorsill and had a flashlight, he could see that the gold letters on the Avis credit card read "M. G. Ash." As he picked up the credit cards, a radio dispatch came in regarding a disturbance in room 30 at Carville's Motel. On hearing the message, Albuquerque told the officers at the scene to hold the five men and left for the motel. Thereafter a crowd gathered, cars stopped and the defendants continued their verbal barrage of foul language. To avoid a public incident, Andrusko asked the men to go to the police station. Reginald Smith drove his own vehicle and the four defendants rode in Officer Witkins' car. None of the defendants had been searched or physically restricted.

When Albuquerque arrived at the motel, he obtained a key, went to the rear of the motel and found Michael Ash bound and gagged on the bed in room 30. Ash told him that four or five Negro males had robbed him, that one had a gun and that his watch, wallet and ring were taken. Leaving another officer to aid Ash, Albuquerque left with

his cruiser and rejoined the officers and the defendants who were en route to the station. After the vehicles stopped, he told the defendants that they were under arrest. Prior to this the defendants had not been told by anyone that they were under arrest. Without a warrant, Albuquerque entered the Rambler and conducted a search. He removed a loaded pistol from under the front seat and seized the watch.

The defendants assign as trial court error the finding of certain facts in the above summary and the refusal to find certain paragraphs of the draft finding. Two of the challenged findings state that the defendants were free to leave the presence of the police at any time until Albuquerque announced their arrest. These findings are not supported by the evidence and are deleted. Evidence supporting the balance of the findings attacked as unsupported can be found in the state's appendix and therefore those assignments of error are without merit. The paragraphs of the defendants' draft finding excluded by the court are neither admitted nor undisputed.

The defendants deny that the police had any legal authority to stop the Smith vehicle, to order them from the vehicle, to remove items from the vehicle or to detain them and therefore claim it was error to admit into evidence the credit cards, watch and pistol.

The fourth amendment protection against unreasonable search and seizure is applicable to state action through the due process clause of the fourteenth amendment. *Camara* v. *Municipal Court,* 387 U.S. 523, 528, 87 S. Ct. 1727, 18 L. Ed. 2d 930; *Ker* v. *California,* 374 U.S. 23, 30, 83 S. Ct. 1623, 10 L. Ed. 2d 726; *Mapp* v. *Ohio,* 367 U.S. 643, 81

S. Ct. 1684, 6 L. Ed. 2d 1081, rehearing denied, 368 U.S. 871, 82 S. Ct. 23, 7 L. Ed. 2d 72. The Connecticut constitution provides the same protection by article first, § 7. Many fourth amendment cases discuss stop and frisk searches or arrests but do not focus on whether the police initially have the right forcibly to stop or detain someone for questioning. A detention of a person against his will constitutes a seizure of his person, and the fourth amendment guarantee of freedom from "unreasonable searches and seizures" is implicated. *Cupp* v. *Murphy,* 412 U.S. 291, 294, 93 S. Ct. 2000, 36 L. Ed. 2d 900; *Terry* v. *Ohio,* 392 U.S. 1, 16, 88 S. Ct. 1868, 20 L. Ed. 2d 889. As was stated in *Davis* v. *Mississippi,* 394 U.S. 721, 726–27, 89 S. Ct. 1394, 22 L. Ed. 2d 676, "[n]othing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" This does not mean, however, that police can never detain a person without probable cause to arrest.

Police have the right to stop for investigation short of arrest "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry* v. *Ohio,* supra, 30, 33. Furthermore, in *Adams* v. *Williams,* 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612, the court held that "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Effective crime prevention and detection underlie the recognition that a police officer may, in appropriate circumstances and

in an appropriate manner, approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* v. *Ohio,* supra, 21. An officer must act on more than a mere hunch. These facts upon which the stop is predicated and the suspicion which they arouse, in addition to forming the basis for a lawful stop, limit the scope of the officer's initial actions following the stop. *Carpenter* v. *Sigler,* 419 F.2d 169, 171 (8th Cir.); see *Terry* v. *Ohio,* supra, 29. The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances.

The trial court found the following facts which provide the basis for Albuquerque's order that the defendants be stopped: (1) Albuquerque observed the defendants' vehicle enter the parking lot, stop behind the Ranch House and discharge four of its occupants at 11:30 p.m. (2) The car then moved to the end of the parking lot next to an exit. (3) The four defendants were not in the restaurant open to the general public. (4) The four defendants, who appeared to be coming from the rear of the motel, walked hurriedly and cautiously across the parking lot to their car. These facts constitute sufficient grounds to support a reasonable suspicion that the defendants were engaged in criminal activity. The

police had the right to stop the defendants. *United States* v. *Santana,* 485 F.2d 365 (2d Cir.); *United State* v. *Owens,* 472 F.2d 780 (8th Cir.), cert. denied, 412 U.S. 951, 93 S. Ct. 3019, 37 L. Ed. 2d 1004; *Diamond* v. *United States,* 471 F.2d 771 (9th Cir.), cert. denied, 412 U.S. 932, 93 S. Ct. 2751, 37 L. Ed. 2d 161; *United States* v. *Wickizer,* 465 F.2d 1154 (8th Cir.); *United States* v. *Garr,* 461 F.2d 487, 489 (5th Cir.), cert. denied, 409 U.S. 880, 93 S. Ct. 170, 34 L. Ed. 2d 135; *United States* v. *Harflinger,* 436 F.2d 928 (8th Cir.); *Carpenter* v. *Sigler,* supra; compare *United States* v. *Davis,* 459 F.2d 458 (9th Cir.); *United States* v. *Nicholas,* 448 F.2d 622 (8th Cir.). In circumstances such as these, the police have a duty to investigate suspicious and unusual behavior. *State* v. *Holmes,* 160 Conn. 140, 146, 274 A.2d 153; *State* v. *Sweeney,* 157 Conn. 485, 490, 255 A.2d 622.

The fact that Officer Witkins did not personally know the above factors is of no moment so long as they were known by Albuquerque when he gave the order to stop the vehicle. *State* v. *Cobuzzi,* 161 Conn. 371, 377, 288 A.2d 439, cert. denied, 404 U.S. 1017, 92 S. Ct. 677, 30 L. Ed. 2d 664; *State* v. *Wilson,* 153 Conn. 39, 42, 212 A.2d 75; *Brown* v. *State,* 295 A.2d 575, 577 (Del.); see *Adams* v. *Williams,* supra, 147. The "collective knowledge of the organization as a whole can be imputed to an individual officer when he is requested or authorized by a superior or associates to make an arrest." *Williams* v. *United States,* 308 F.2d 326, 327 (D.C. Cir.).

The facts of this case after the initial stop present a good example of flexible police action escalating in response to the reactions of suspects. After the stop, the driver's lack of cooperation, the verbal abuse aimed at the police officers, the late hour and

the commotion in the vehicle provided adequate reason for Albuquerque's request that the defendants get out of the vehicle. Since the door was opened by reason of a lawful investigation and the credit cards inadvertently came into view as the defendants exited the car, the plain view doctrine clearly applied. See *Coolidge* v. *New Hampshire,* 403 U.S. 443, 465–71, 91 S. Ct. 2022, 29 L. Ed. 2d 564, rehearing denied, 404 U.S. 874, 92 S. Ct. 26, 30 L. Ed. 2d 120. "It has long been settled that objects falling in the plain view of an officer who has the right to be in a position to have that view are subject to seizure and may be introduced in evidence. *Ker* v. *California,* 374 U.S. 23, 42–43 [83 S. Ct. 1623, 10 L. Ed. 2d 726]; *United States* v. *Lee,* 274 U.S. 559 [47 S. Ct. 746, 71 L. Ed. 1202]." *Harris* v. *United States,* 390 U.S. 234, 236, 88 S. Ct. 992, 19 L. Ed. 2d 1067; *State* v. *Krause,* 163 Conn. 76, 81–84, 301 A.2d 234; see annot., 29 L. Ed. 2d 1067. This doctrine is applicable even though the objects were seen at a time other than during the course of a lawful search. See annot., 29 L. Ed. 2d 1067, 1072–73 n.5. Although Albuquerque examined the "shiny object" more closely after he first observed it, there was no seizure as the watch was left in its original position. At any rate, his observation of the watch was also well within the plain view doctrine.

Albuquerque's order to hold the defendants while he checked out the disturbance at Carville's Motel was a reasonable preservation of the status quo during further investigation, in view of the defendants' previous suspicious actions at the motel and their denial that they had been there. *Adams* v. *Williams,* supra, 146. Neither the continued hold on the defendants nor the request that they go to the

station constituted an arrest. While the officers did exercise control over the defendants, detaining them in the manner described was reasonable and within the scope of the right of the police to investigate in these circumstances.

When Albuquerque rejoined the defendants en route to the police station and arrested them he had reasonable and sufficient grounds to believe that the defendants had committed a felony to constitute probable cause for the arrests.

The search of the vehicle and the seizure of the loaded pistol and the watch took place at the site of and immediately after the arrest. *Warden* v. *Hayden,* 387 U.S. 294, 298, 87 S. Ct. 1642, 18 L. Ed. 2d 782; *Preston* v. *United States,* 376 U.S. 364, 367, 84 S. Ct. 881, 11 L. Ed. 2d 777; *State* v. *Cari,* 163 Conn. 174, 187, 303 A.2d 7; *State* v. *Cobuzzi,* supra, 377–79.

Assuming, arguendo, that even though an automobile was involved the standards set out in *Chimel* v. *California,* 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685, rehearing denied, 396 U.S. 869, 90 S. Ct. 36, 24 L. Ed. 2d 124, were not met owing to the fact that the defendants and Smith were removed from the automobile at gunpoint and consequently the interior of the automobile was inaccessible to them either as a source of weapons or for the purpose of destroying evidence, the situation unquestionably provided the exigent circumstances and probable cause to justify the search. *Chambers* v. *Maroney,* 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419, rehearing denied, 400 U.S. 856, 91 S. Ct. 23, 27 L. Ed. 2d 94. The court was not in error in admitting into evidence the credit cards, watch and pistol.

The defendants claim that the in-court identification of the defendants by the victim of the robbery and binding was tainted by the pretrial identification procedures. The Windsor police used photographs instead of a corporeal lineup in securing Ash's identification of the defendants. The standards of due process apply to photographic identification procedures. Pretrial identification by photographs can be successfully attacked on constitutional grounds "if the photographic identification procedure was so impermissively suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247; *State* v. *Oliver,* 161 Conn. 348, 358–60, 288 A.2d 81. "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neil* v. *Biggers,* 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 401. Whether the facts of a particular case are so suggestive and conducive to mistaken identification as to violate the accused's due process rights must be determined in the totality of the circumstances. *Stovall* v. *Denno,* 388 U.S. 293, 301–2, 87 S. Ct. 1967, 18 L. Ed. 2d 1199.

In a hearing held in the absence of the jury, the court found the following facts:[1]   Michael Ash

---

[1] The defendants have assigned as error that certain facts in the trial court's finding were found without evidence and that the court erred in not finding certain paragraphs in their draft finding. The claims that the court found facts without support are unfounded as the state's appendix contains the necessary evidence to support the attacked findings. The defendants argue that draft findings based upon uncontradicted testimony of state's witnesses were wrong-

checked into room 30 of Carville's Motel in the afternoon of June 25, 1970. Around midnight he opened his door to go to his car when he was pushed back into the room by a Negro male with a revolver. Three other Negro males then followed the first into the room. After one of the men ordered him to lie on the bed, Ash was bound, gagged and was struck in the eye. Ash saw the men when they entered the room, when he was on his back on the bed and when he was picked up to be carried into the bathroom. There was a light over the outside of the door and the area was well lit. The three lights in the room enabled a clear view of all four men for a couple of minutes. Ash had a constant view of the man with the gun, identified as the defendant Evans, from the time he entered the room. He also saw the defendant Stroman at a distance of two feet.

Later that night at the hospital, Ash could only tell the police that four or five Negro males had attacked him. The next day, June 26, 1970, while still at the hospital, Ash was shown nine photographs. Prior to viewing the photographs, Ash was able to give a basic description of the height and weight of two or three of his attackers. The photographs shown to Ash were all of the same size and were in color. Seven portrayed a single Negro man each and two showed two Negros. The photographs were first given one at a time with no sequence. The first time through Ash identified Evans and Stroman

fully omitted from the court's finding. "Facts are not admitted or undisputed merely because they are not contradicted. The question of credibility is for the trier." *Shakro* v. *Haddad,* 149 Conn. 160, 162, 177 A.2d 221. Further, a finding will not be corrected by the addition of facts that will not affect the result. *Lewis* v. *Lewis,* 162 Conn. 476, 481, 294 A.2d 637; *Malone* v. *Steinberg,* 138 Conn. 718, 720, 89 A.2d 213.

but passed over Watson and Carter. The photographs were then laid out in front of him and he examined them all at once. He positively identified Evans and Stroman and tentatively identified Carter and Watson. He also identified Smith, who had never entered the motel room, as one of his assailants. During the trial Ash identified all four defendants in court as those who entered his room on June 25, 1970. His in-court identification of Watson and Carter was no less vivid than that of Stroman and Evans.

The foregoing circumstances do not present a case of impermissible suggestiveness. A display of colored photographs all of the same size, all of Negro men, is not inherently suggestive. Furthermore, there is no requirement that a certain number of photographs be shown to a witness. *Simmons* v. *United States*, supra. The court's conclusion reciting the *Simmons* standard that there was no "substantial likelihood of irreparable misidentification" is amply supported by the finding on this issue. *Neil* v. *Biggers*, supra. Since there was no taint of illegality, there was no need for the state to prove that the photographic identification procedure was not the basis for the courtroom identification of the defendants. Aside from this, the court's conclusions that the in-court identification was based upon an independent and untainted recollection and that the totality of the circumstances presented a strong case of almost positive identification are supported by the finding.

The defendants claim that under the principle enumerated in *United States* v. *Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149, their constitutional right to counsel was violated when their photographs

were taken and the pictures were thereafter shown to the victim. The short answer to the rather lengthy argument made in the brief on this issue is that the sixth amendment does not grant the right of counsel at photographic displays conducted by the prosecution for purposes of allowing a witness to attempt identification. *United States* v. *Ash*, 413 U.S. 300, 321, 93 S. Ct. 2568, 37 L. Ed. 2d 619. The claims of the defendants that the court erred in permitting the state to offer testimony of the prior out-of-court identification of the defendants by Ash necessarily fall as they are based on the right of counsel at the time of the photographic identification procedures and the claim that the *Simmons* standard was violated. The evidence was clearly admissible. *State* v. *Frost*, 105 Conn. 326, 341–42, 135 A. 446.

During the hearing in the absence of the jury on the question of the admissibility of Ash's in-court identification of the defendants, Albuquerque testified that Officer Joel Kemp went to the hospital and interviewed Ash the night of the assault. On cross-examination he testified that he had recently reviewed Kemp's written report of this interview to refresh his recollection. Defense counsel requested the opportunity to examine the report, but the state objected and the objection was sustained. Exception was duly taken by all the defendants. It is evident that both the state and the court relied upon the rule in such cases as *State* v. *Pambianchi*, 139 Conn. 543, 547–48, 95 A.2d 695. In that case, a witness testified that he had given a written statement to the police. After requiring counsel to state the inconsistencies which he thought the statement might reveal, the lower court refused to order production of the document. This was held to be a proper

exercise of the court's discretion. The so-called inconsistency rule, however, is inapplicable here. The defendants sought the report not to show conflict between the testimony and the written document, but because Officer Albuquerque had recently used it to refresh his recollection.

Had the report been used to refresh the recollection of the witness while testifying, it is unquestioned that defense counsel would have a right to examine the report. *State* v. *Grimes,* 154 Conn. 314, 323, 228 A.2d 141; *Neff* v. *Neff,* 96 Conn. 273, 280–81, 114 A. 126. In this case, the witness did refresh his recollection, not while testifying but prior to the time he went on the stand. The authorities are divided on whether counsel does have the right to examine a document used by a witness to refresh his recollection prior to testifying. 3 Wigmore, Evidence (Chadbourn Rev. 1970), p. 140; 4 Jones, Evidence (5th Ed.) §§ 967, 974; McCormick, Evidence (2d Ed.) § 9; annot., Refreshing Recollection, 82 A.L.R.2d 473, §§ 63, 64. It has been the practice in our trial courts to follow the majority rule "that where a witness has refreshed his present recollection prior to the time of giving testimony, by the use of papers or memoranda out of court, he is not, unless the court in its discretion orders otherwise, obliged to produce them to allow the opposing party to make an inspection." Annot., 82 A.L.R.2d 562, § 63, and cases cited. We see no justification at this time to change our rules so as to allow counsel to inspect any material that may have been used by a witness to refresh his recollection prior to taking the witness stand. Whether such inspection be allowed should remain in the sound discretion of the trial judge. The court was not in error in its ruling.

The defendants' claim that the court erred in allowing any evidence as to treatment of the victim's eye is without merit. The evidence was relevant to the charge of robbery with violence and the court's discretion was not abused. *Robinson* v. *Faulkner,* 163 Conn. 365, 371, 306 A.2d 857; *State* v. *Keating,* 151 Conn. 592, 597, 200 A.2d 724, cert. denied sub nom. *Joseph* v. *Connecticut,* 379 U.S. 963, 85 S. Ct. 654, 13 L. Ed. 2d 557. This same principle is applicable to the claim of error concerning Albuquerque's testimony that when he saw the four defendants walking across the parking lot they appeared to be coming from the rear of the motel.

After all parties had rested, but before arguments to the jury had commenced, the state moved to open its case in order to present further evidence on the charge of unlawfully carrying a revolver in a motor vehicle. The state had already presented evidence that none of the four defendants had had a gun permit but had not offered evidence as to whether any permit had been issued to Smith, the driver of the Rambler. The court granted the motion and the state offered the limited testimony that no gun permit had been issued to Reginald A. Smith of 15 Overlook Drive, East Hartford. The defendants claim error in the court's granting the motion to open, but this ruling was not an abuse of the court's discretion. *State* v. *Lenihan,* 151 Conn. 552, 556, 200 A.2d 476; *State* v. *Ricker,* 90 Conn. 147, 150–52, 96 A. 941; *State* v. *Williams,* 90 Conn. 126, 131–32, 96 A. 370.

Each defendant was convicted, pursuant to the third count, of violating § 29-38.[2] The court not only

<hr>

[2] "[General Statutes] Sec. 29-38. WEAPONS IN VEHICLES. Any person who knowingly has, in any vehicle owned, operated or occupied by him, any weapon for which a proper permit has not been issued

charged on the essential elements of the crime but referred to and commented on that portion of the statute providing "the presence of any such weapon in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof." Exception was clearly taken by all defendants to this portion of the charge. The defendants argue that the broad presumption created by the statute gives the right to the jury to infer the other elements of this crime from mere presence in a motor vehicle where a weapon is found in violation of their rights of due process.

Sufficient evidence was produced to support a finding that the defendants knew of the presence of a weapon in the vehicle. There is some question as to the state's proof that none of the five occupants had a permit for the gun. The evidence presented by the state after the motion to open did not rule out the fact that the Smith who accompanied the defendants did not have a permit. Even if the state's evidence on this latter element is assumed sufficient, there must be a review of the statutory presumption since it was part of the charge to the jury. "It has long been settled that when a case is submitted to the jury on alternative theories the unconstitutionality of any of the theories requires that the conviction be set aside." *Leary* v. *United States,* 395 U.S. 6, 31, 89 S. Ct. 1532, 23 L. Ed. 2d 57.

"The phrase 'prima facie evidence' means evidence which, if credited, is sufficient to establish the

---

as provided in section 29-28 or section 53-206, or has not registered such weapon as required by section 53-202, as the case may be, shall be fined not more than one thousand dollars or imprisoned not more than five years or both, and the presence of any such weapon in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof."

fact or facts which it is adduced to prove." *Mott's Super Markets, Inc.* v. *Frassinelli,* 148 Conn. 481, 489, 172 A.2d 381, and cases cited. The legislature has the power to provide by statute that proof of one fact shall establish a presumption or shall constitute prima facie evidence of another. However, "a criminal statutory presumption must be regarded as 'irrational' or 'arbitrary,' and hence unconstitutional, unless it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." *Leary* v. *United States,* supra, 36; see *United States* v. *Romano,* 382 U.S. 136, 86 S. Ct. 279, 15 L. Ed. 2d 210; *United States* v. *Gainey,* 380 U.S. 63, 85 S. Ct. 754, 13 L. Ed. 2d 658; *Tot* v. *United States,* 319 U.S. 463, 63 S. Ct. 1241, 87 L. Ed. 519; *Ducharme* v. *Putnam,* 161 Conn. 135, 140–42, 285 A.2d 318; *Mott's Super Markets, Inc.* v. *Frassinelli,* supra, 490; 1 Wharton, Criminal Evidence (13th Ed.) § 94.

Proof of presence of a weapon in a motor vehicle, although relevant and admissible evidence on the charge made in this case, is insufficient standing alone to show a violation of the statute with "substantial assurance." It cannot be logically and reasonably presumed that an occupant of a motor vehicle knew of the presence of an unregistered weapon in a vehicle simply on the fact that he was an occupant. Presence alone, "unilluminated by other facts" is insufficient proof of possession. *United States* v. *Romano,* supra, 141–42. Imputing knowledge of the presence of a weapon in a vehicle to an occupant without proof of any other relevant circumstance would be based on pure speculation and could not meet the standards reiterated in *Leary* v. *United States,* supra.

The prima facie provision of § 29-38 has the inevitable effect of placing on the alleged violator the burden of proving his innocence. The provision "and the presence of any such weapon in any vehicle shall be prima facie evidence of a violation of the section by the owner, operator and each occupant thereof" constitutes a denial of due process of law as protected by the fourteenth amendment and is therefore invalid. The court was in error in charging on the invalid provision of the statute and in instructing the jury that the defendants could be found guilty of the statute on proof of their presence in the Smith vehicle.

It is not necessary to find the entire statute invalid since the presumption and the balance of the statute are not so mutually connected and dependent as to indicate a legislative intent that they should stand or fall together. General Statutes § 1-3; *Adams* v. *Rubinow,* 157 Conn. 150, 170-71, 251 A.2d 49; *Mott's Super Markets, Inc.* v. *Frassinelli,* supra, 491-92; *Amsel* v. *Brooks,* 141 Conn. 288, 300, 106 A.2d 152, appeal dismissed, 348 U.S. 880, 75 S. Ct. 125, 99 L. Ed. 693; *State* v. *Wheeler,* 25 Conn. 290, 299. The remainder of the statute establishes each essential element of the crime and the invalid provision is clearly severable.

The last claim of error of the defendants is that there was insufficient evidence to support the verdicts rendered. The appendices to the briefs support the verdicts as to the first and second counts of each information and no useful purpose would be served by reciting the evidence printed therein which was substantially that previously recited in this opinion.

There is no error as to the verdicts in the first and second counts in each information. There is error in the verdicts in the third count in each information.

There is error, the judgments are set aside as to the third count in each information and the cases are remanded with direction for a new trial on the charge of possession of an unlicensed weapon in a motor vehicle in violation of General Statutes § 29-38.

In this opinion HOUSE, C. J., SHAPIRO and MAC-DONALD, Js., concurred.

BOGDANSKI, J. (dissenting). The majority opinion reaffirms its adherence to the rule that notes or writings used by a witness to revive his recollection must be given to the opponent on demand for inspection and cross-examination, but only if the writing is referred to by the witness when he is testifying on the stand. I believe that the opposing party should have the right to examine any writing purportedly used to refresh recollection for the purpose of testifying, whether the witness used it while on the stand or prior to taking the stand. The distinction made is artificial and without reason.

Allowing a witness to refresh his recollection entails the risk that he will testify, consciously or unconsciously, to what is in the writing and not to what is in his memory. The best way discovered by the law to protect the opponent against "the risk of imposition and false aids" is to permit him to inspect the notes and writings used by the witness to refresh his memory, and to use them in cross-examination to test the trustworthiness of the witness' testimony. 3 Wigmore, Evidence (Chadbourn Rev. 1970) § 762.

No logical reason exists for restricting the opponent's right to examine the writing because the witness consulted it before he took the stand. "[T]hough there is no objection to a memory being thus stimulated, yet the risk of imposition and the need of safeguard is just as great. It is simple and feasible enough for the court to require that the paper be sent for and exhibited before the end of the trial." 3 Wigmore, op. cit., p. 140. "[T]he public interest in the full disclosure of the source of a witness's testimony seems a weightier consideration" than discouraging "prying into the opponent's file." McCormick, Evidence (2d Ed.) § 9. The advisory committee which drafted the proposed Federal Rules of Evidence agrees. See Rule 612 of the Federal Rules of Evidence, 56 F.R.D. 183, 276–77. A growing number of courts have already adopted this position. See Annot., 82 A.L.R.2d 473, 566–69, and, especially, *State* v. *Mucci,* 25 N.J. 423, 436, 136 A.2d 761; the court there concluded that "it is but just and right . . . that the rule apply to writings so used by the witness before trial as when the refreshment is . . . had while he is on the stand." See also *Doxtator* v. *Swarthout,* 38 App. Div. 2d 782, 328 N.Y.S.2d 150; *State* v. *Deslovers,* 40 R.I. 89, 103–5, 100 A. 64. This court should not lag behind.