THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL DREAD, Appellant.

First Department, November 20, 1975

*Michael Dread,* appellant *pro se.*

*Gerald M. Labush* of counsel *(Robert M. Pitler* with him on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

LUPIANO, J. On March 1, 1973, defendant was arrested for possessing five and one-half pounds of heroin. By an indictment filed March 16, 1973, defendant was charged with criminal possession of a dangerous drug in the first degree. His motion to suppress was denied on May 24, 1973 after a hearing. Following a jury trial, defendant was convicted of the crime charged in the indictment.

In sum and substance, the testimony adduced during the suppression hearing is as follows: On March 1, 1973, at 1:30 A.M., Sergeant Morgan, Patrolman Leonard and Patrolman Crowe, assigned to the 30th Precinct Anti-Crime Unit, were patrolling in Leonard's unmarked Plymouth. They saw a Lincoln Continental with four male occupants double-parked on St. Nicholas Place near 153rd Street. This locale is a high-crime area (robberies and drug crimes). The Lincoln was the only double-parked car in the area and was placed under surveillance. Two men dressed in dark coats emerged from the Lincoln and walked two blocks to "The Showplace Bar & Grill" at 155th Street and St. Nicholas Place. Approximately 10 minutes later, three men—two in dark coats and the third in a lighter coat—walked from the bar and grill back to the Lincoln. The man in the lighter coat entered the car while the other two remained on the sidewalk near the vehicle. About five minutes later, a car proceeding north on St. Nicholas Place drew up alongside the Lincoln, remained for some 30 seconds and then proceeded to 154th Street. Some 10 minutes thereafter, a third car, a Buick, stopped across from the Lincoln. One of the two men in dark coats standing near the Lincoln walked over to the Buick and conversed with the driver. The Buick then proceeded slowly to 153rd Street with the same dark-coated man walking after it. After a short interval (about five minutes), this same male returned to St. Nicholas Place and had a brief conversation with the driver of the Lincoln. The other dark-coated male came over from the sidewalk. Then the Lincoln backed down St. Nicholas Place and turned west onto 153rd Street where the Buick had just been driven. The two men in dark coats followed on foot. Patrolman Leonard drove to 153rd Street and St. Nicholas Place and the Lincoln and Buick were observed to be double-parked together. Between the vehicles stood defendant and

another, the former carrying two large paper bags while the latter possessed one such bag. At this point, Patrolman Crowe exited from the Plymouth and displaying his shield stated: "Halt, police, freeze." Defendant and his companion both looked in the direction of the officers, dropped the bags and began running. Officers Leonard and Crowe, guns drawn, caught them after a short chase. Sergeant Morgan at the same time told the occupants of the Lincoln to come out. Three men emerged from the Lincoln and were herded to a building wall together with defendant and Hill. Before the officers could approach the other vehicle, the Buick, it started down the block in reverse while an occupant thereof fired 6 to 10 shots at the officers. Despite return fire from the officers, the Buick successfully left the scene.

Part of the contents of one of the three paper bags dropped by defendant and Hill had spilled out. These contents were observed to be packets of powder-filled glassine envelopes. Sergeant Morgan placed the packets back in the bag. Officer Leonard then opened the remaining two bags and found similar heroin-filled glassine envelopes. Thereupon defendant and Hill were arrested for criminal possession of a dangerous drug.

CPL 140.50 entitled "Temporary questioning of persons in public places; search for weapons" provides in subdivision (1) that "a police officer may stop a person in a public place located within the geographical area of such officer's employment when he *reasonably suspects* that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor defined in the penal law, and *may demand* of him his name, address and *an explanation of his conduct*" (emphasis supplied). The circumstances delineated above disclose an attempt by the police to initiate interrogation of citizens based not on mere whim but upon justifiable suspicion that criminal activity was afoot. It is well recognized that such an investigative effort to ascertain the purpose of said people in the area, arising here from personal observation, is justified by reasonable suspicion which is lower (less stringent) than the standard of probable cause for arrest (see *People v Moore,* 32 NY2d 67). As noted by the Court of Appeals (p 69): "The touchstone under the statute as well as under the Federal Constitution is reasonableness. Where probable cause for an arrest is lacking, the forcible encounter, the stop, or the seizure, of a citizen by a police officer must arise

from a reasonable suspicion that criminal activity is afoot." To the same effect is the apt analysis of BERGAN, J., speaking for a unanimous Court of Appeals in *People v Rosemond* (26 NY2d 101, 104):

"Many subjects, other than the commission of felonies, and many grounds, other than a reasonable suspicion that felony is in budding process, will justify police inquiry.

"A statute, such as this one, addressed to a particular situation and designed to give legal justification for specially prescribed procedures ought not to be read to narrow down the normal duty of police to find out by suitable inquiry what is going forward in the public streets. *To be alert, aware and knowledgeable of street events would seem the fundamental test of competent and skillful police work.*

"The normal duty of police inquiry on the street without statutory prescription of grounds or subject matter existed before the enactment of section 180-a [source of Criminal Procedure Law § 140.50] *(People v Rivera,* 14 NY2d 441, cert den 379 US 978) and the legal theory of *Rivera* on the initial general right of police inquiry on the streets was approved in the note to Chief Justice WARREN's opinion in *Terry v Ohio* (392 US 1, 11, n 5).

"The right of inquiry upon grounds less compelling than those which would justify an arrest and also on grounds less compelling than those stated in section 180-a as authorizing a demand to answer have been classified as a previously existing common-law basis for police inquiry *(People v Peters,* 18 NY2d 238; *People v Taggart,* 20 NY2d 335, 339). This right, pre-existing the statute, continues, and is not impaired by the specifics of section 180-a.

"The police can and should find out about unusual situations they see, as well as suspicious ones. It is unwise, and perhaps futile, to codify them or to prescribe them precisely in advance as a rule of law. *To a very large extent what is unusual enough to call for inquiry must rest in the professional experience of the police.*

"But reasonable ground to suspect a felony goes forward should not be the sole criterion on which inquiry may be activated. Nor is inquiry interdicted even though most of what it elicits may be quite innocent" (emphasis supplied).

Viewed in light of the aforesaid, the attempt by the police to initiate an investigative inquiry into the purpose of the

unusual activity engaged in by the occupants of the two cars, resting as it does in their professional experience and knowledge of street events, under the imprimatur of CPL 140.50 is easily countenanced as an example of competent and skillful police work. Indeed, in the absence of CPL 140.50, the inquiry would appear to be justified in light of the circumstances herein under the "previously existing common-law basis for police inquiry". "Prompt inquiry into suspicious or unusual street action is an indispensable police power in the orderly government of large urban communities" *(People v Rivera,* 14 NY2d 441, 444).

The efforts by the police to ascertain the purpose of the defendant and the others between or in the automobiles, were frustrated by the flight of the defendant and Hill and the escape of the Buick from which shots were fired at the officers. These circumstances, coupled with the spilled contents of one of the three paper bags dropped as aforesaid, clearly constituted probable cause and justified the arrest of the defendant. Once the officers saw defendant take flight at their approach, they were clearly entitled to pursue him (see *People v Rivera, supra; People v Archiopoli,* 39 AD2d 748). The seizure of the three bags dropped by defendant and Hill, with the contents of one spilling out, thus being in plain view to the police, was reasonable and proper.

*People v Cantor* (36 NY2d 106) relied on by defendant involved the issue of whether the conduct of the police in their initial stopping of the defendant was reasonable. The record therein was found to be barren of any circumstances preceding the stop which could be classified equivocal or suspicious. It was concluded "that the investigative inquiry exceeded permissible bounds in its inception *and* scope. The police had *no reason* to question this defendant and there was no justification for *surrounding him* in a manner constituting a seizure" *(People v Cantor, supra,* p 114; emphasis supplied). To state the facts underlying *Cantor* is to highlight the palpable presence in the record herein of reasonable suspicion justifying legitimate police inquiry—Cantor was observed by a member of a three-man surveillance team in the early morning smoking with a female companion in a friend's Brooklyn apartment. It was the officer's belief that the cigarettes were marijuana. After leaving the apartment, Cantor and his female companion drove to his Queens residence followed by the three officers. As Cantor parked in front of his home, the

unmarked police vehicle halted 20 to 40 feet behind; two officers exited and the remaining officer then drove the car in front of Cantor's and blocked it. The officer operating the vehicle then left same. Cantor emerging from his automobile, holding his dog and house keys, was confronted by the three officers in street clothes approaching him from different directions. It was found that Cantor then produced a pistol of his own volition and *after* the police identified themselves, defendant was arrested and the pistol was seized. The issue was thus not one involving the propriety of the search, "if indeed there was one", but rather the propriety of "the initial seizure of the defendant's person" with the observation "that if the initial stop of the defendant was unlawful the evidence thereafter acquired must be suppressed absent an independent establishment of probable cause" *(People v Cantor, supra,* p 111). Comparison of the barren record in *Cantor* indicating no unusual or suspicious activity with the circumstances in the instant case compels conclusion that the investigative inquiry attempted by the police herein did not exceed permissible bounds in its inception. Further, the precipitate action of defendant together with the immediate subsequent events, served as probable cause for his arrest.

We have reviewed the remaining contentions raised by defendant on this appeal and conclude that they are without merit. Accordingly, the judgment of the Supreme Court, New York County (PECORA, J.) convicting defendant after jury trial of criminal possession of a dangerous drug in the first degree should be affirmed.

MURPHY, J. (dissenting). Since I find this case even weaker than our recent reversal in *People v Diaz* (50 AD2d 526), I dissent.

Three police officers patrolling in an unmarked vehicle claim they observed a Lincoln Continental double-parked on St. Nicholas Place, near 153rd Street, in the Borough of Manhattan. Since the hour was late (1:30 A.M.) and the neighborhood was allegedly considered "a high-crime area", the officers decided to place the Lincoln under surveillance. From their vantage point about two blocks away they observed, within the next 30 minutes: two men in dark coats exit from the Lincoln and walk to a local tavern two blocks away; two men in dark coats and a third man wearing a lighter colored garment emerge from the bar, and walk back to the Lincoln; an unidentified car draw alongside the Lincoln

and stop for about 30 seconds; a Buick stop across from the Lincoln; one of the two individuals wearing a dark coat standing near the Lincoln walk over to the Buick and converse with the driver thereof; and then first the Buick and thereafter the Lincoln proceed westward on 153rd Street. The officers, to regain sight of their subjects, drove to 153rd Street and St. Nicholas Avenue where they observed both cars double-parked with defendant and a female, both wearing dark coats, standing between the cars holding large "grocery-type" paper bags.

On essentially these facts, defendant was told to "freeze" by one of the officers. Defendant and his female companion then allegedly dropped the bags they were holding, fled and were recaptured. Thereafter, glassine envelopes containing a substantial quantity of heroin were found in the brown paper bags (one of which had assertedly opened) and the Buick fled the scene after shots were fired at the officers by one or more of its occupants.

Proper determination of the motion to suppress depends, of course, not on what was subsequently recovered but, rather, on the validity of the initial interception. *(People v Cantor,* 36 NY2d 106.) In my view the disclosed activities of this defendant, even assuming he was one of the dark-coated individuals originally observed by the officers (a fact never clearly established), was insufficient to justify his original seizure. Vague, generalized references to "high-crime areas" cannot raise otherwise innocuous behavior to the level of reasonable suspicion, much less probable cause. As in *Cantor,* the instant "record is barren of any objective evidence evincing criminal activity * * *. Indeed, the events preceding the unlawful stop could not even be classified equivocal or suspicious (see *People v Corrado,* 22 NY2d 308)." *(People v Cantor,* 36 NY2d 106, 113.)

Accordingly, the judgment appealed from should be reversed, the motion to suppress granted and the indictment dismissed.

STEVENS, P. J., MARKEWICH and KUPFERMAN, JJ., concur with LUPIANO, J.; MURPHY, J., dissents in opinion.

Judgment, Supreme Court, New York County, rendered on December 7, 1973, affirmed.