THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RAYMOND DE JESUS, Appellant.

Second Department, December 27, 1976

*William E. Hellerstein* and *William J. Gallagher (Susan A. Powers* of counsel), for appellant.

*Eugene Gold, District Attorney (Helman R. Brook* of counsel; *Linda James McKay* on the brief), for respondent.

MARTUSCELLO, J. The defendant appeals from a judgment of the Supreme Court, Kings County, convicting him, upon a plea of guilty, of attempted possession of weapons and dangerous instruments and appliances, as a felony. The appeal brings up for review a decision which, after a hearing, denied defendant's motion to suppress physical evidence. The judgment should be affirmed.

During the early morning hours of December 11, 1973, Detectives Edward Denaro and Vincent Rizzo were on radio motor patrol as part of a special burglary unit attached to the 84th Precinct. In the course of their duties they came to patrol the promenade located at the foot of Montague Street in the Brooklyn Heights section of Brooklyn, between the hours of 12:30 and 1:00 A.M. The promendade, which had become the site of numerous muggings, is closed to the public between the hours of midnight and 6:00 A.M.

As they turned their vehicle onto the promenade, Detective Denaro (the recorder) observed two males sitting on the row of benches nearest to the guardrail overlooking the water and, pursuant to instructions by his superiors that he urge all violators to leave (under pain of citation), the detective directed his partner to halt the vehicle for the purpose of directing the men to depart. Detective Rizzo stopped the patrol car and went over to the two men. The bench on which they were sitting was located to the left of the patrol car.

About a minute later, Denaro realized that his partner must have been having trouble and he started to exit the patrol car. He then heard Rizzo call out that one of the two men had a gun. Denaro turned and saw Rizzo "scuffling" with an armed man. At this point Denaro completed his exit and drew his

gun. When he turned toward Rizzo, Denaro saw "movement on the right [or opposite] side", turned, saw the defendant and his brother-in-law stand up quickly from a position on another bench located about 15 feet directly behind the first bench and then saw the defendant push open his coat "as if to go inside". Denaro then pointed his gun at these two men and directed them to raise their hands, turn around and put their hands on the fence. They did so and, when the defendant asked Denaro what the problem might be, the latter answered that one of the two men on the other bench had been found with a gun and that "[y]ou [the defendant] might have one". Denaro then frisked the defendant and found a handgun.

The row of benches on which the defendant had been sitting runs parallel to the first row, but is located next to the bushes, some 15 feet to the rear. As thus situated, the patrol car was *between* the two rows, so that the detectives were, in effect, bracketed by the two pairs of men. Denaro described his reactions as follows:

"[W]hen I stepped out of that car, I observed somebody move on my right side. I immediately turned; I faced the guy; I didn't know what was going on. I knew there was a gun involved and two guys stood up. *I saw movement and I was afraid.* I thought possibly they had a gun. I had no idea of what was going on. It happened so fast.

"Q What was the total time lapse between the time you arrived there until the time you recovered the gun from the defendant?

"A I'd say about thirty seconds.

"Q And it would be less time from the time you heard your partner shout until you recovered the gun from the defendant.

"A Just a few seconds after he hollered" (emphasis supplied).

I believe that Detective Denaro's response to the situation was fully authorized pursuant to CPL 140.50 (subds 1, 3) as being grounded upon reasonable suspicion: (1) that the person being detained was "committing * * * [had] committed or * * * [was] about to commit" a crime; and (2) that he, the detaining officer, was "in [present] danger of physical injury" (see *People v Cantor,* 36 NY2d 106, 112-113; *People v La Pene,* 40 NY2d 210, 223).

Under the circumstances of the present case, Detective Denaro was aware from the outset of the presence of two

unknown males situated to the left of the patrol car, late at night, in an area with a high incidence of muggings and after the promenade was officially closed to the public. He was also aware, by virtue of the passage of time, that his partner must have been having trouble. It was with this in mind that he exited the patrol car. Upon alighting from the vehicle, he heard his partner call out that one of the two men had a gun, whereupon he turned toward Detective Rizzo and saw him "scuffling" with one of the men. He also saw a gun. Simultaneously he saw movement on his right side, turned and saw the defendant and his brother-in-law getting up quickly from a bench located about 15 feet directly behind the first bench. The defendant "was brushing" open his coat "as if to go inside", at which point Denaro pointed his pistol at both men and told them to raise their hands, turn around and place their hands on the fence. He then frisked both of them, recovering a gun from the defendant. Thus, as of the time that he acted, Denaro knew for a fact that all four men were present illegally on the promenade, late at night, in mid-December, and that they were located in close proximity. He also knew that one of the first pair of men had a gun in his possession and was struggling with his partner, that the second pair of men (whose presence he had just discovered) had gotten up fast at the first sign of trouble and that one of the latter pair (the defendant) had made a move to "go inside" his coat. The area was well known as a location for muggers and, in addition, the detectives were, for all practical purposes, bracketed by the four men. Under those circumstances, all of which came about in the space of a few seconds, it is my opinion that Denaro became simultaneously possessed of sufficient "specific and articulable facts" to satisfy both requirements of CPL 140.50 and that his simultaneous stop and frisk of the defendant was justified thereunder (see *People v Cantor,* 36 NY2d 106, 113, *supra).*

I do not read *People v Sanchez* (38 NY2d 72) as requiring a different result. In that case the Court of Appeals noted (at pp 74-75): "Officer Martin, the only witness for the People, did not testify that he believed he was in danger nor did he state that the 'hard object' which he felt upon accidentally touching the defendant was or felt like a weapon. On the contrary, he * * * [testified] that the defendant was not doing anything suspicious before he took several steps toward the exit, and, further, that [prior thereto, he believed that the] defendant

might [even] have been the victim of the robbery which the officers suspected to [have been] * * * in progress." Under those circumstances, the court found no "articulable foundation" for the resultant stop and frisk, as: "[t]he search was not based upon any reasonable suspicion articulated by the police officer that he was in fear of physical danger as required by CPL 140.50 (subd 3) (see, also, *Terry v Ohio,* 392 US 1, 24) * * * [nor was] the fact that he felt a 'hard object', which may have been a glasses case, comb or wallet * * * [a sufficient] ground for such suspicion. [Moreover,] no preliminary inquiry was made of the defendant as required by CPL 140.50 (subd 1) (see *People v Rosemond,* 26 NY2d 101; cf. *People v Hunter,* 30 NY2d 774, 776). [In short,] the police possessed no information linking defendant to possession of a weapon (see *People v Moore,* 32 NY2d 67, 72; *Adams v Williams,* 407 US 143); and, furthermore, no exigent circumstances were present to justify the immediate intrusion into defendant's pockets *(People v Taggart,* 20 NY2d 335, 342-343). In sum, the officer could point to no 'particular facts' from which an inference could be drawn that defendant posed an imminent danger to him or his partner *(People v Mack,* 26 NY2d 311, 316-317; *Sibron v New York,* 392 US 40, 64)" *(People v Sanchez, supra,* p 75; footnote omitted).

Somewhat similarly, I view *People v La Pene* (40 NY2d 210, *supra)* as being distinguishable on its facts. In that case the Court of Appeals again noted the absence of exigency in voiding a stop and frisk which was made incident to an anonymous telephone tip. Thus, the court stated (p 226):

"As previously described the situation confronting Officer Sheeran and his brother officers was not one fraught with tension or hostility. They entered a bar which has not been characterized as being located in a high-crime area and about which they had received no reports of criminal or dangerous activity, other than the anonymous phone call. In contrast to the patrolman in *De Bour* who saw the waistband bulge, Officer Sheeran testified that he did not notice any external sign of the weapon on La Pene's person. In addition, the arresting officer acknowledged that La Pene was not acting in a suspicious or furtive manner, a factor which would have lent credence to the tip. Moreover, there was no pressing urgency to act in order to defuse a volatile situation or to prevent escape. Despite this absence of exigency, the four policemen approached the first person they spotted who fit the

vague description, ordered him to 'freeze' and then frisked him—all without asking a single question (compare, e.g., *People v Rosello,* 36 AD2d 595; *People v Joslin,* 32 AD2d 859) * * *

"Had the police proceeded with the inquiry to which they were entitled, they may well have been able to determine whether or not a crime was occurring and whether or not La Pene was the perpetrator. As it was, the police resorted to the type of aggressive behavior which cannot be condoned."

It is this element of exigency, lacking in both *Sanchez* and *La Pene,* which distinguishes the case at bar and which renders this stop and frisk lawful. I do not, moreover, read either case as precluding a limited frisk in the absence of prior interrogation where the circumstances warrant it (see CPL 140.50, subd 3; *People v Taggart,* 20 NY2d 335; cf. *People v La Pene,* 40 NY2d 210, 226, *supra; People v Sanchez,* 38 NY2d 72, 75, *supra).*

I note, in passing, the recent reversal by the Court of Appeals of our determination in *People v Earl* (40 NY2d 941, revg 50 AD2d 289 [on dissenting opn of Mr. Justice SHAPIRO]), but consider that case to be distinguishable on its facts from the case at bar.

HOPKINS, Acting P. J., LATHAM, RABIN and HAWKINS, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered December 13, 1974, affirmed.