THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v EMANUEL BATISTA and FRANCES BRANCIFORTE, Respondents.

First Department, June 26, 1979

APPEARANCES OF COUNSEL

*Craig P. Murphy* of counsel *(Jerrold L. Neugarten* with him on the briefs; *Robert M. Morgenthau, District Attorney),* for appellant.

*Richard Steel* for Frances Branciforte, respondent.

*Demostenes Roque* for Emanuel Batista, respondent.

**OPINION OF THE COURT**

MURPHY, P. J.

The facts are fairly stated in the dissenting opinion and need not be repeated in the majority opinion.

■ A person, otherwise acting innocently, may not be arrested merely because he was in the company of another person who had engaged in criminal activity *(People v Griffith,* 63 AD2d 138, 142; *People v Trapier,* 47 AD2d 481, 483). However, under certain circumstances, a person's presence at a crime scene might furnish a trained policeman with probable cause to arrest him *(People v Martin,* 32 NY2d 123, 125). The primary question presented upon this appeal is whether the police officers were justified in arresting the respondents, Emanuel Batista and Frances Branciforte, on the basis of their prior association with Francisco Batista.

As the dissenting Justice observes, the act of buying a holster is lawful. Therefore, that act, in and of itself, cannot serve as a predicate for the common-law right to inquire or for the higher degrees of police intrusion set forth in *People v De Bour* (40 NY2d 210, 223). Since the police officers did not approach the respondents outside the novelty store to request information as the proposed use of the holsters, it is unnecessary to explore whether such an information inquiry would have been proper as a minimal intrusion under *De Bour* *(supra).*

The police officers began a surveillance of the three individuals when they exited the novelty shop. In that high-crime area, the surveillance was reasonably undertaken by the police for there was a possibility that the holsters were bought to encase illegal firearms. Likewise, during the course of the surveillance, there is no indication that the officers unlawfully interfered with the freedom of movement enjoyed by the three individuals.

Further, the plainclothes officers never announced their

identity. The three individuals, sensing that they were being followed, took a circuitous walk about the Times Square area. From time to time, they glanced over their shoulders at the trailing officers. The three individuals had no reason to know whether they were being followed by officers or felons. In these circumstances, the officers would not have been justified had they stopped the three individuals on the ground of reasonable suspicion *(People v Towers,* 49 AD2d 839). Consequently before Francisco Batista drew his gun and was arrested, the police did not have probable cause to arrest the respondents or to search them under CPL 140.50 (subd 3).

Thus, the more narrow issue is whether the police response, after Francisco had been arrested, was reasonable with regard to the respondents. Whenever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment *(People v Cantor,* 36 NY2d 106, 111). When Officer De Stacio saw the gun in Francisco's hand, she grabbed the respondents by the shoulders and held them. In essence, Officer De Stacio placed the respondents under arrest (cf. *People v Bronk,* 66 Misc 2d 932, affd 31 NY2d 995). To that point in time, the respondents had not engaged in any overt criminal activity. Hence, there was no probable cause for the arrest *(People v Martin, supra,* pp 124-125). Since the arrest was unlawful, the motion to suppress should have been granted *(People v Cantor, supra,* p 111).

■ For purposes of discussion, it will be assumed that the police were justified in frisking the respondents and in inspecting the canvas bag under the authority of CPL 140.50 *(People v Sterling,* 63 AD2d 210; *People v De Jesus,* 55 AD2d 196; but see *People v Sanchez,* 38 NY2d 72). As is mentioned in the dissenting opinion, the officers did not frisk the respondents or inspect the canvas bag on the arrest site. Instead, the officers physically seized, unlawfully arrested and placed the respondents in an unmarked police vehicle. CPL 140.50 does not provide the police with the authority to perform a frisk at another time and another place. Furthermore, while there is some indication in the record that other members of the public were present at or near the arrest site, there is no testimony in the record that a hostile populace required that the frisk be effected elsewhere.

For the foregoing reasons, the order of the Supreme Court,

New York County (Leff, J.), entered June 12, 1978, granting respondents' motions to suppress, should be affirmed.

Lupiano, J. (dissenting). The People of the State of New York appeal from an order of the Supreme Court, New York County (Leff, J.), entered on June 12, 1978, which suppressed a .38 caliber revolver and six rounds of ammunition seized from defendants Emanuel Batista and Frances Branciforte at the time of their arrest,[1] and statements they later made to the arresting officers. Defendants were indicted for criminal possession of a weapon in the third degree (Penal Law, § 265.02).

On March 11, 1978, at approximately 9:40 p.m., in a high-crime area, Detectives Juan Sanchez, John Shaw, Jeremiah O'Shaughnessy and Police Officer Maureen De Stacio (all in plainclothes), while outside a novelty shop on 42nd Street between Seventh and Eighth Avenues, observed defendant Emanuel Batista and his brother Francisco Batista inside the novelty shop *trying on,* i.e., adjusting shoulder holsters on each other, these articles being among the items for sale at these premises. Defendant Emanuel Batista was observed to possess a brown canvas bag and to be also accompanied by his girlfriend, defendant Frances Branciforte. The Batistas purchased the two shoulder holsters which were placed in a paper bag and given to them. The trio then left the store and headed east on 42nd Street toward Seventh Avenue. At a distance of about 10 to 20 feet, the police followed. As the trio approached Seventh Avenue, defendant Emanuel Batista passed the canvas bag he was carrying to defendant Frances Branciforte.

At the intersection of 42nd Street and Seventh Avenue, the trio turned south on Seventh Avenue and walked to 40th Street, only to turn around and walk north on Seventh Avenue. During this period, the trio were constantly looking over their shoulders in the general direction of the police (in plainclothes) who were following in order to keep the trio under observation. In proceeding north on Seventh Avenue, defendant Emanuel's brother, Francisco, began to walk ahead of his two companions, so that by the time he reached the intersection of Seventh Avenue and 44th Street, he was approximately 20 feet ahead.

The detectives endeavored to keep up with Francisco, while Officer De Stacio remained in position behind, that is, trailing,

---

1. or initial seizure for interrogation

the defendants herein. There were a number of other pedestrians at this time. Abruptly, Francisco, on attaining the 44th Street intersection, turned around and walked south, i.e., he reversed his direction until he was standing face-to-face with Detective Sanchez. "He looked into [Detective Sanchez'] eyes and he started to run north." After running several feet, he pulled a revolver from his waistband and pointed it at Detective Shaw, who shouted a warning to his fellow officers: "He's got a gun." Detective Sanchez struck Francisco with the butt of his gun and the latter dropped the weapon on the ground, where it was retrieved by Detective Shaw.

Concomitant with these circumstances, Officer De Stacio, observing the defendants looking around, and fearful that they would endeavor to flee, grabbed the defendants by the shoulders and told them that she had a gun in their backs, although, in fact, she had not drawn her revolver. The defendants did not resist.

In aiding the placement of the trio in a police department vehicle, Officer De Stacio took the canvas bag from defendant Branciforte. While the vehicle was proceeding toward the Midtown South Police Station, Officer De Stacio started to open the canvas bag. Defendant Branciforte told her, "the only thing that belongs to me in there is my purse." De Stacio discovered a .38 caliber revolver loaded with six rounds of ammunition in the bag which she handed to Detective Sanchez. At that point, unsolicited, defendant Batista declared that the weapon was not his. At the police station, the trio were informed of their *Miranda* rights. As defendant Branciforte was searched, she kept telling Officer De Stacio: "I don't know why they are arresting me. The gun isn't mine. I was just carrying it in the bag." She also told the officer that she was holding it for defendant Emanuel Batista. Further, at one point while not being explicit as to whom she was referring, Branciforte declared: "I wouldn't get charged with this because he is going to take the weight."

While Detective Sanchez was processing defendant Emanuel Batista, he inquired if the latter planned "to let his girlfriend take the weight on the weapon", to which Emanuel responded that "he was going to take responsibility for having the gun." He volunteered that he and his brother Francisco had purchased the gun uptown on the west side and had then gone to 42nd Street to buy holsters.

At the suppression hearing, the Supreme Court denied the

motion to suppress the revolver which Francisco Batista had pulled from his waistband, but determined to suppress the gun taken from the canvas bag theretofore handed by defendant Emanuel Batista to defendant Frances Branciforte and the statements uttered by these two defendants in respect of this weapon. The basis given by the court for this ruling was that there was no evidence based on the conduct of the parties in walking around the Times Square area that justified the arrest of these two defendants, that is, the physical seizure of these two defendants. In making this pronouncement, the court declared: "My own experience tells me that there are probably thousands of canvas bags with guns in them." Relying on *People v De Bour* (40 NY2d 210), the hearing court stated that the suspicious conduct exhibited herein did not justify the arrest of the defendants and intimated that only actual knowledge on the part of the police that a gun was in the bag would justify the authorities in restricting the movements of these two defendants.

The testimony of the various members of the police department who testified at the suppression hearing is not inherently incredible or improbable. Indeed, the over-all view of their testimony reinforces the conclusion that it is credible and represents a true scenario of this incident. Defendants presented no evidence at the hearing. Further, the hearing court did not base its suppression ruling on disbelief of the officers' testimony, but on the basis that the circumstances as testified to above, did not justify the seizure of the defendants and subsequent search of the canvas bag.

At the outset, it must be noted that the police, based upon their initial observation of defendants and Francisco Batista, merely engaged in keeping the trio under surveillance and did not intrude in any manner on the freedom of these citizens. Considering that the area is a high-crime area, that it was late in the evening, and that the two brothers, Francisco and defendant Emanuel, were directly observed by the police to be personally fitting themselves for the wearing of shoulder holsters, it would be sheer folly and a gross deviation from acceptable and responsible police conduct to ignore these circumstances. Patently, the police are not proscribed from fulfilling a crime prevention function and to distort *People v De Bour (supra)* into a legal precedent, for such prosecution would constitute a gross travesty of the rationale of that oft-cited case.

We have had occasion to note that "[n]o one needs a permit or license to purchase or carry a holster. Indeed, a holster may serve a number of purposes, decorative and otherwise. However, the general purpose of a holster is to serve as a case for a firearm, to wit, a pistol to be carried on the person. Patently, it is well recognized that in New York City a permit is required for the possession of a pistol and also for the right to carry such weapon on one's person. If one endeavors to possess and carry such firearm without the requisite permit, one is in violation of law" *(People v Samuels,* 68 AD2d 663, 667-668). Here, the police did not just observe the defendant Emanuel and his brother Francisco in the company of Emanuel's girlfriend, defendant Branciforte, purchase two holsters; they also observed the two men fitting each other with shoulder holsters which were subsequently purchased. Reason and common sense thus strongly indicated the purpose to which these items would be put, namely, the wearing of firearms on the person.

Under the circumstances, upon the trio exiting the novelty store, the police had the option of immediately engaging in an inquiry as to the purpose for the purchase of the holsters or of delaying such inquiry and engaging in further surveillance. Their choice of the latter course herein cannot be faulted on this record and is fully in accord with good police procedure. It is not argued and it cannot be seriously advanced that the initial observation did not justify such surveillance.

What did the surveillance produce? It resulted in conduct undertaken by the trio which strongly indicated apprehension on their part that they might be the subject of police surveillance—thus their perambulation about the Times Square area involving two reversals of direction characterized by repeated glances in the direction of the police surveillance team. To the conduct of inspecting, *fitting,* i.e., trying on shoulder holsters and the purchase of same, are now added actions revelatory of apprehension on the trio's part that they might be the subject of police surveillance. The unfolding drama of this street encounter culminates in precipitate action, not on the part of the police, but on the part of a member of this trio, Francisco Batista. This precipitate conduct effectively frustrated during the course of this limited surveillance any further opportunity for the police to initiate an informational inquiry of the trio. Suffice it to say, suspicion that the plainclothes officers might be police, coalesced into reasonable certainty, at least on the

part of Francisco, and he engaged in flight, coupled with the production of a firearm.

To reiterate, the police observed the fitting on and purchase of shoulder holsters by the two brothers which is indicative of intended use on the person. A holster's recognized general purpose is to serve as a carrying case or receptacle for a firearm. Common sense, therefore, alerted the police to the possibility that the two men might be armed, i.e., they each possessed a firearm. In the ensuing surveillance, the observation of the passing of the canvas bag, which might contain a firearm, from Emanuel to his girlfriend Branciforte, raised an additional possibility, i.e., that anyone of the trio might be in possession of a firearm. The subsequent production of a firearm by a member of the trio, to wit, Francisco, occasioned solely by precipitate conduct on Francico's part, reinforced the common-sense possibility that another of the remaining members of the trio might be armed. Thus, from an initial circumstance justifying the ensuing surveillance, the train of events rapidly escalated into a situation where the police properly entertained probable cause to believe that the defendants herein had committed a crime.

As we have noted in *People v Dickerson* (67 AD2d 122, 126), "as a general observation, a culprit's criminal activity with its train of events, including * * * apprehension, presents a mosaic to the mental 'eye.' Upon subjecting this mosaic to the intense scrutiny demanded by the vital, but ever rigorous, legal principles, evidentiary and otherwise, operating in the criminal law, we find that the mosaic itself is sometimes lost sight of. Ofttimes the mosaic crumbles into minute fragments which bear little resemblance to the reality of that over-all picture in which they originally inhered. Again, reason relates that the particular experiences of our daily existence do coalesce into an ordered view, pattern, and a higher degree of comprehension." Applying this tenet to the instant matter, it is clear that it was not just the fitting on and purchase of the holster by the two brothers, not just the fact that the area was a high-crime area,[2] not just the perambulations of this trio permeated by conduct on their part indicative of an increasing awareness of the police surveillance, not just the sudden

2. "Concededly, the incidence of a high crime rate is a relevant circumstance to be considered in determining the existence of probable cause (see *People v Brown,* 32 NY2d 172, 174; *People v Hunter,* 30 NY2d 774, 776; *People v Rivera,* 14 NY2d 441, 445)" *(People v Oden,* 36 NY2d 382, 385).

confrontation by a member of this trio with one of the plainclothes detectives, not just the abortive attempt at flight and the production of a revolver by a member of the trio, not just the conduct of the other members of the trio indicative of avoidance of detection, but the totality of all these events which gives rise to probable cause to arrest or to seize for purposes of station house interrogation.

At this point in our analysis, it must be noted that both Officer De Stacio and Detective Sanchez testified at the hearing that the defendants herein were not arrested on the street, an arrest being effected at that point as to Francisco. In essence, the police testimony reflects seizure of the defendants herein for purposes of detentive inquiry under circumstances allowing a further limited intrusion, to wit, the search of the canvas bag, which search ripened into probable cause to arrest defendants for possession of the gun contained in the canvas bag. Where exigent circumstances are such as to justify a reasonably limited detention of a citizen for purposes of effecting a safe inquiry, the police conduct in undertaking such precautionary measure may not be characterized as unreasonable. The exigent circumstances herein arise from the locale of this incident, the initial observation with subsequent surveillance, the conduct on the part of a member of the trio justifying an arrest of that member, the danger posed to the police and the citizenry in the immediate area by the production by such member of a gun with the probability that another gun was in the possession of the remaining members of the trio. A reasonably limited detention for purposes of undertaking inquiry where the police have reasonable ground to suspect a felony goes forward conducted with a view toward maximizing the safety of the police and citizens in the area of the initial stop and arising not from whim or caprice on the part of the police, but from the necessity of exigent circumstances, appears to be clearly justifiable police conduct not unduly restrictive of the freedom of a citizen (cf. *People v Dread,* 49 AD2d 401). Further, the precautionary action by the police is justifiable in view of the high-crime area with the pragmatic necessity of avoiding confrontation between the police and members of the citizenry who might take it upon themselves to interfere with the law enforcement authority in the discharge of its duty. The necessity for a reasonably imminent undertaking of such inquiry may be rendered academic where a lawful search of a bag taken from the hand of

a party suspected of possessing a gun, discloses, as here, the presence of such gun, justifying an immediate arrest.

The detentive inquiry envisioned is an *immediate* summary inquiry which by virtue of exigent or special circumstance is conducted, not at the locus of the initial stop, but at another place. At the very least, the *bare minimum* needed to convince the officers that there is probable cause to believe that the defendants have committed a crime does not impose on them a duty to arrest, but would justify seizure for purposes of full investigative inquiry at the police station (cf. *Davis v Mississippi,* 394 US 721; see *United States v Vita,* 294 F2d 524, 529-531; see, also, *People v Rivera,* 14 NY2d 441). As a general proposition station house detention may be justified only by probable cause regarding the issue of whether an offense has occurred. However, given the presence of exigent circumstances, the summary and immediate inquiry justified by less than probable cause, but by reasoned suspicion (not mere hunch, whim or caprice) may be conducted in a police vehicle or even at a station house in the immediate area adjacent to the initial seizure, provided the inquiry is reasonably immediate and the circumstances are not indicative of unreasonable police conduct overly intrusive of the freedom of a citizen. A balancing test is required which balances the intrusion against the need.

On this record, however, it is clear that at least the bare minimum of probable cause was present justifying seizure of the defendants by the police for a station house inquiry. Assuming such a demonstration of probable cause was not present, then an alternative basis justifying the police conduct herein is, I submit, present in the exigent circumtances delineated above. In light of the locale of this incident and the panoply of unfolding circumstances, the immediate inquiry envisioned by the common-law right to inquire and the "stop and frisk" statute could be conducted, not on the street, where the initial seizure occurred, but in the police vehicle. Discovery of the gun in the canvas bag at the inception of the journey, however, obviated the need to conduct such inquiry immediately in the vehicle.

*People v De Bour* (40 NY2d 210, *supra)* represents a well-reasoned legal exegesis on the proper method for evaluating the reasonableness of police conduct in relation to street encounters. It is designed to deal with the dynamics of such encounters and, therefore, requires, vital, not static applica-

tion, i.e., it does not in and of itself proscribe the police in any manner in engaging in the proper exercise of their law enforcement function. We are impelled to apply with requisite skill and common sense the rational guidelines thus afforded by the Court of Appeals in an endeavor to properly evaluate police conduct in a given set of circumstances. As aptly stated in *People v De Bour (supra,* p 223): "We bear in mind that any inquiry into the propriety of police conduct must weigh the interference it entails against the precipitating and attending conditions. By this approach various intensities of police action are justifiable *as the precipitating and attendant factors increase in weight and competence"* (emphasis supplied). Essentially, *De Bour* outlines four tiers of intensity of police conduct reflecting the dynamics of a changing street encounter—informational inquiry, common-law right to inquire, forcible stop and detention and right to arrest and take into custody.

In analyzing the circumstances herein, we should recognize that the police, indeed the citizenry at large, are not unmindful of the statistics as to the use of handguns in the commission of crime.

As to the definition of "probable cause", it is initially noted that CPL 70.10 (subd 2) provides in pertinent part: " 'Reasonable cause to believe that a person has committed an offense' exists when evidence or information which appears reliable discloses facts or circumstances which are *collectively* of such weight and persuasiveness as to convince a person of *ordinary intelligence, judgment and experience* that it is *reasonably likely* that such offense was committed and that such person committed it" (emphasis supplied). Case law declares: "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of *reasonable caution* in *the belief that'* an offense has been or is being committed. *Carroll v. United States,* 267 U.S. 132, 162" *(Brinegar v United States,* 338 US 160, 175-176; emphasis supplied; see, also, *People v Oden,* 36 NY2d 382, 384, *supra).* The key is reasonableness of the police conduct.[3]

---

3. The Fourth Amendment to the Constitution of the United States declares: "The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated, and no Warrants shall issue, but upon *probable cause,* supported by Oath or affirmation, and particularly

It almost seems pointless to again recall what should be self-evident, namely, that "(i)n dealing with probable cause * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. * * * 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt' " *(Brinegar v United States, supra,* p 175).

While the mere purchase of a holster is equivocal and may be suspicious, the purchase of a shoulder holster after a personal fitting on the person of that holster clearly renders the circumstances suspicious. In a high-crime area, such conduct serves to put a reasonable man on notice that the party might well have a gun, i.e., it establishes a possibility that the person has a firearm in his possession. As a general proposition the logical counterpart of an empty shoulder holster is a handgun to fit into such holster. Accordingly, these initial circumstances giving rise to the police surveillance blossomed into a situation justifying arrest based on probable cause. "We are cognizant of the fact that police-citizen encounters are dynamic situations during which the degree of belief possessed at the point of inception may blossom by virtue of responses or other matters which authorize and indeed require additional action as the scenario unfolds" *(People v De Bour, supra,* p 225). The precipitate action by a member of this trio, Francisco, displaying a handgun, would clearly impel a reasonable and prudent man to infer that either defendant Emanuel Batista or defendant Frances Branciforte was in possession of a second handgun, the logical counterpart of the second holster (cf. *People v Sterling,* 63 AD2d 210).

Patently, the conduct of the police in seizing the trio at the conclusion of the sequence of events delineated above must be evaluated from the point of view of the reasonable and prudent man, not from a point of view which deems the police to be imbued with the qualities of legal technicians. The police activity herein "was justified by the well understood duty of a police officer both to be alert and to be prudent. In *People v Rivera* (14 NY2d 441, 444-445, cert den 379 US 978) the Court of Appeals said: 'Prompt inquiry into suspicious or unusual street action is an indispensable police power in the orderly government of large urban communities. It is a prime func-

---

describing the place to be searched, and the persons or things to be seized" (emphasis supplied).

tion of city police to be alert to things going wrong in the streets' " *(People v Miller,* 52 AD2d 425, 430).

It was not the mere fortuitous presence of Emanuel Batista and Frances Branciforte on the street when Francisco Batista pulled a gun on the police which establishes probable cause as to them, but the totality of the circumstances arising from the initial association of this trio, carried through as a logical thread to the culminating point when Francisco's open display of a gun confirmed the officers' suspicions that the trio had purchased holsters for use with the guns they were carrying. In essence, the circumstances surrounding the purchase of the holsters, the further equivocal and increasingly evasive conduct of the suspects after they left the novelty shop, and Francico's display of a handgun established probable cause to believe that Emanuel Batista and Frances Branciforte were in possession of a second handgun (cf. *Sibron v New York,* 392 US 40, 66-67; *People v Moore,* 32 NY2d 67, 71).

The consequent searching of the canvas bag by Officer De Stacio which disclosed the presence of the second gun was clearly proper. "It is well established that once the police have lawfully taken possession of an arrested person's property, especially where there is knowledge or probable cause that it contains contraband or evidence of the crime, they have the right to examine it—to search it—within a reasonable time and at a reasonably convenient place for such contraband or other evidence of the crime for which the arrest was made *(People v. Perel,* 34 N Y 2d 462, 466-468; *People v. Brosnan,* 32 N Y 2d 254, 260-261; *People v. Brady,* 16 N Y 2d 186, 189). This is so, even if the search may not be justified as an incident of the arrest *(Chambers v. Maroney,* 299 U.S. 42, 47-48)" *(People v Fustanio,* 35 NY2d 196, 199-200). Further, the search here may be regarded as self-protective because the police could, under these circumstances, reasonably infer that the defendants were armed and dangerous. Common sense dictates that the police in seizing the defendants and engaging in inquiry would not desire to run the risk of a response entailing a "hail of bullets" (see *People v Sterling,* 63 AD2d 210, 215, *supra;* see, also, *Sibron v New York, supra,* p 64; *People v Moore, supra).*

Beyond peradventure, having properly arrested Francisco Batista, the police properly seized defendants herein for the purpose of bringing them together with Francisco to the police station. As aptly noted in *People v Hassele* (53 AD2d 699,

701): "Under the circumstances of this case, and a proper arrest having been made, the search of [the canvas] bag [held by defendant Branciforte] was proper and the [gun] was properly seized (see *People v Moore,* 32 NY2d 67, *supra).* In *People v Moore (supra),* the concealed weapon was found in a handbag. The Court of Appeals therein noted (p 71), that 'with the exigent circumstance of a weapon involved, we think it would be unreasonable to expect the police officer to have questioned the suspect preliminarily or to have engaged in a preparatory and perhaps dangerous, and almost certainly ineffectual, pat-down of the handbag' and that 'Under the circumstances, we think the limited intrusion involved in searching the defendant's handbag was reasonable'."

In light of the aforesaid, it necessarily follows that the statements given by defendants to the police, as narrated above, are admissible.

To reiterate, the conduct of the police herein, whether the initial seizure of defendants be viewed as an arrest or a seizure for limited detention purposes with a view toward inquiry and a frisk or reasonably limited search for a gun incidental to the arrest of Francisco, is reasonable and proper.

An excellent statement of the nature of probable cause is found in *United States v Davis* (458 F2d 819, 821): "The contours and salient principles of probable cause have been faithfully catalogued in a surfeit of decisional law. Probable cause exists when known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that an offense has been or is being committed. * * * A significantly lower *quanta* of proof is required to establish probable cause than guilt. * * * Probable cause does not emanate from an antiseptic courtroom, a sterile library or a sacrosanct adytum, nor is it a pristine 'philosophical concept existing in a vacuum,' * * * but rather it requires a pragmatic analysis of 'everyday life on which reasonable and prudent men, not legal technicians, act' * * *. It is to be viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training. * * * It is 'a plastic concept whose existence depends on the facts and circumstances of the particular case.' * * * Because of the kaleidoscopic myriad that goes into the probable cause mix 'seldom does a decision in one case handily dispose of the next.' * * * It is however the totality of these facts and circumstances

which is the relevant consideration. * * * Viewed singly these factors may not be dispositive, yet when viewed in unison the puzzle may fit." It should be sufficient to note that "[t]here is no war between the Constitution and common sense" *(Mapp v Ohio,* 367 US 643, 657).

Further, the objective standard embraced within "probable cause" considers as a factor, *inter alia,* the experience and expertise of the officer making the search or arrest. "What constitutes 'probable cause' for searches and seizures must be determined from the standpoint of the officer, with *his* skill and knowledge, rather than from the standpoint of an average citizen under similar circumstances" *(People v Symmonds,* 18 Ill App 3d 587, 597; see, also, *United States v Davis, supra).*

It should also be noted that the mere fact than an innocent explanation for the activity of the defendants herein may be imagined is not enough to defeat the probable cause showing when the "succession of superfically innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one" *(United States v Martin,* 509 F2d 1211, 1213; *United States v Patterson,* 492 F2d 995, 997). The probability that a crime has been or is being committed was undoubtedly heightened respecting the two defendants herein when the third member of the trio engaged in the precipitate conduct of drawing a pistol from his waistband and pointing it at the police.

In summary, even if it may be concluded that probable cause requires that criminal activity be "more probable than not", it is clear that an officer need not know exactly what kind of crime has occurred, in order to effectuate an arrest (see *United States ex rel. Frasier v Henderson,* 464 F2d 260; *Bates v United States,* 327 A2d 542 [DC App]).

By way of postscript, the following observations on "probable cause" may be illuminating.

In light of the trenchant rationale of *Brinegar* (338 US 160, *supra)* it might well be concluded that probable cause is a variable, not a fixed test, and permits consideration of the intrusion as compared or contrasted with the need in a particular situation. It has been aptly asked whether the policy of the Fourth Amendment might not "be better served by an approach which determines the reasonableness of each investigative technique by balancing the seriousness of the suspected crime and the degree of reasonable suspicion pos-

sessed by the police against the magnitude of the invasion of the personal security and property rights of the individual involved" (Barrett, Personal Rights, Property Rights and the Fourth Amendment, 1960 Sup Ct Rev 46, 63). To avoid the evils inherent in a nebulous or ambiguous variable probable cause test, the overriding dictate of prudence and common sense may be regarded as the touchstone, especially as regards the nature of the intrusion posed by the investigative activity. Obviously, an investigative activity which is *especially intrusive* would not under such test as is here urged survive constitutional scrutiny if only the bare minimum probable cause standard was satisfied (see *Berger v New York,* 388 US 41; see, also, *Gooding v United States,* 416 US 430).

Accordingly, the order of the Supreme Court, New York County (LEFF, J.), entered June 12, 1978, which granted the defendants' motions to suppress the gun and six rounds of ammunition and the statement made by them to the People, should be reversed, on the law, the motion should be denied and the case remanded for further proceedings.

SULLIVAN, BLOOM and LANE, JJ., concur with MURPHY, P. J.; LUPIANO, J., dissents in an opinion.

Order, Supreme Court, New York County, entered on June 12, 1978, affirmed.