OPINION OF THE COURT
James G. Starkey, J.
Defendant, having been indicted for murder in the second degree, criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree, moved to suppress property, a statement and identifications of defendant by two witnesses. He demanded suppression urging that the police had illegally seized defendant and the property and that a weapon, the statement and the two identifications should be suppressed as the fruits of the poisonous tree. The prosecution argued that the police had acted reasonably in the circumstances and that defendant’s legal rights had not been violated.
A hearing was held during which Detective Peter Nickolich and Sergeant Arthur J. Stoecke (both of the New York City Police Department), and Housing Police Officer Gerard Fitzpatrick testified for the prosecution. Defendant presented no witnesses. The motions were denied on March 12, 1992 based upon the following findings of fact and conclusions of law.
the facts
On the evening of January 7, 1991 defendant Antoine *581 Thompson — possibly acting in concert with four others — shot and killed one Antonio Alcidea Ragin in front of 76 Belmont Avenue, Brooklyn, New York. At the time — though the body of the deceased was screened by a parked car — a security guard nearby saw defendant firing shots from a handgun at the place on the sidewalk where, moments later, the guard observed the body of the deceased. Immediately after that, a second security guard in the area saw a group of four black males run across Belmont Avenue and then observed defendant, holding a handgun in his right hand, running south on the same thoroughfare.
After viewing the body, the first security guard followed defendant and saw him enter a building nearby, 365 Sackman Street. The guard then returned to the scene of the homicide where, shortly before 5:30 p.m., he met two New York City Housing Police Officers — Gerard Fitzpatrick and Kwame Jackson — who had received a report of the shooting. The guard told the officers that he had seen the culprit — a black male wearing beige pants and a dark jacket — shoot at the deceased and then enter 365 Sackman Street. The police officers and the guard immediately proceeded to 365 Sackman Street, where they arrived at about 5:30 p.m.
The police officers left the security guard in the lobby and ascended in an elevator to begin searching the building from the top down. Along the way, a female entered the elevator and the officers informed her that they were looking for a black male, wearing beige pants and a dark jacket, who had just entered the building. The woman replied that she knew the person in question, stated the name of the individual she had in mind and said that he lived in apartment 4C.
The police officers then went to apartment 4C and, for the better part of an hour, they and other police officers repeatedly knocked and identified themselves. Though the police could hear movement inside the apartment, no one came to the door during that time.
After several such efforts to induce a response from the person or persons inside, the Emergency Services Unit was called to assist. Then, about 45 minutes after the arrival of the first two officers, a tenant — one Pamela King — arrived on the scene. She informed the police who she was, gave them written consent to enter and search the apartment and also provided keys to accomplish the entry.
Police officers entered the apartment at about 6:40 p.m. and *582 found inside five male blacks, including defendant — the precise number observed fleeing from the vicinity of the homicide after the shooting. Though found in the apartment, defendant was a visitor, not a resident. A search then resulted in the seizure of a .22 caliber handgun found in a plastic bag on a shopping cart in a bedroom.
In the meantime, a crowd of about 45 people had gathered between the fourth floor and street level of the building, including some around the patrol cars in front of the building. The second security guard was, by this time, present in the lobby of the building with the one who had accompanied the police to the building, but security considerations militated against the holding of an identification procedure at the scene. The supervising officer, Sergeant Stoecke, feared possible retaliation against any identifying witness, possible intimidation of witnesses and/or the possibility of disorder if an identification procedure were attempted at the scene. He therefore directed that the suspects and witnesses be transported to the 73rd Precinct a short distance away. The trip to the precinct and preparations for viewing the suspects by the witnesses were quickly accomplished and, prior to 7:15 p.m. the five suspects and a sixth black male unconnected with the shooting or the apartment were gathered in a viewing room. The suspects were permitted to choose the chairs in which they would be viewed and defendant chose chair number two. Each person was then given a number card to hold corresponding to the chair occupied, after which a photograph of the group was taken. Each witness was then separately brought to view the lineup through a "one way window” and each in turn identified defendant as the gunman observed in the vicinity of the homicide. None of the four males detained with defendant was identified. Those men were released and defendant was arrested.
Thereafter — following the arrival and briefing of an Assistant District Attorney — statements were taken from each witness. Then, at about 11:00 p.m., Detective Nickolich gave defendant the Miranda warnings. Specifically, he stated to defendant: (1) you have the right to remain silent and to refuse to answer questions, (2) anything you say can be used against you in a court of law, (3) you have the right to consult with an attorney before speaking to the police and to have an attorney present during any questions now or in the future, (4) if you cannot afford an attorney, one will be provided for you without cost, and (5) if you do not have an attorney *583 available, you have the right to remain silent until you have had the opportunity to consult with one. After each warning, defendant was asked if he understood and he answered "yes”. He was then asked if, having been advised of his rights, he was willing to answer questions and he replied that he was. Defendant then freely and willingly gave a statement in which, while denying guilt, he admitted having handled the weapon seized in the apartment and having been in the vicinity of the shooting near the time it occurred.
CONCLUSIONS OF LAW
Based upon the above facts, defendant urged (1) that apartment 4C was illegally searched and that the weapon should be suppressed as the fruit thereof, (2) that defendant — in the absence of probable cause — had been illegally arrested and that the identifications at the precinct and the admissions which followed should be suppressed as the fruit of the poisonous tree, and (3) that the identification procedure was unnecessarily and impermissibly suggestive in any event, mandating suppression of the identifications of defendant.
Defendant’s claim that the weapon should be suppressed is devoid of merit. In the first instance, as a mere visitor to the premises — and one who has not demonstrated anything resembling a reasonable expectation of privacy there — defendant lacks standing to complain of a search of someone else’s apartment. (See, People v Rodriguez, 69 NY2d 159, 163-164 [1987].) It is well settled that the courts will entertain complaints of a violation of one’s personal right to be free of unreasonable searches, but not complaints that someone else’s rights were invaded. (See, People v Rodriguez, supra.)
Further, even if defendant had been a resident of the apartment the lawfulness of the search would have been unaffected. It is undisputed that a valid consent to search the apartment was obtained from the tenant Pamela King. That consent authorized a lawful search, even in the absence of consent of another resident or other residents. (See, People v Cosme, 48 NY2d 286, 292 [1979]; People v Adams, 53 NY2d 1, 8 [1981].)
The transportation of defendant to the precinct for the identification proceeding, however, presents more difficult questions. At the outset, it seems clear that the evidence in hand (including the information that the gunman and four other young black males had fled the scene of the shooting, *584 the gunman had entered 365 Sackman Street, and a female tenant had stated that the person the police were pursuing lived in apartment 4C, coupled with the prolonged refusal of those present in the apartment, knowing the police were knocking, to answer the door and the discovery that those present in the apartment included five young black males— the same number viewed fleeing the scene) provided at least reasonable suspicion that the young men in the apartment were involved in the shooting, that one was the triggerman and that at least one weapon might be found on one of them or in the apartment. Given the circumstances, it also seems clear that the five young men could be lawfully seized pending a search for the weapon and a reasonably speedy attempt to identify the culprit or culprits by displaying the five to the witnesses — either by bringing the witnesses to the suspects or the suspects to the witnesses. (See, e.g., People v Hicks, 68 NY2d 234 [1986]; People v Acevedo, 102 AD2d 336 [1st Dept 1984].)
Defendant, while conceding that a detention of the defendant and his companions would have been lawful for the purpose of permitting an attempted identification by the witnesses in the building or in front of it, urges that — no matter how compelling the reasons or how speedily the task was accomplished — the quick transportation of the suspects and the witnesses to the precinct and the prompt accomplishment of the identification procedure there transformed a lawful detention into an unlawful one mandating suppression.
The argument, however, is flawed. If, based upon reasonable suspicion, temporary detention for the purpose of holding an identification procedure is permissible, and if it is permissible either to bring the witnesses to the suspects or the suspects to the witnesses to hold the procedure, there is no reason apparent in logic or law why — to avoid possible disorder and security problems and permit a fairer identification procedure, as well — both suspects and witnesses may not be transported to a third site for the procedure. (See, People v Acevedo, supra; see also, People v Batista, 68 AD2d 515, 517, and dissent of Lupiano, J., at 524 [1st Dept 1979] [suggesting that the presence of a hostile populace can provide a basis for moving a suspect detained on reasonable suspicion to a more secure locale].)
It is true that approximately 35 minutes is a longer detention than is usually involved in lawful temporary stops based upon reasonable suspicion. (See, e.g., United States v *585 Sharpe, 470 US 675 [1985] [approximately 20 minutes]; People v Harris, 186 AD2d 148 [2d Dept 1992] [approximately 30 minutes]; United States v Quinn, 815 F2d 153 [1st Cir 1987] [approximately 20 to 25 minutes]; but see, United States v Davies, 768 F2d 893, 902 [7th Cir 1985] [45 minute detention upheld].) There is, however, no bright line limit insofar as time is concerned. Indeed, the Supreme Court has repeatedly declined to specify a time limit beyond which a detention on reasonable suspicion becomes unlawful. (See, e.g., United States v Sharpe, supra, at 686; United States v Place, 462 US 696, 709 [1983].) An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. (See, Florida v Royer, 460 US 491, 500 [1983].) Whether the police diligently pursued their investigation will be taken into account. (See, United States v Place, 462 US 696, 709 [1983], supra.) Whether the conduct of the suspect created a situation which prolonged the time required to complete the investigation will also be considered. (United States v Sharpe, supra, at 687-688.)
Nor does transportation of a suspect to a precinct in a police vehicle mandate the conclusion that the person was under arrest. (See, People v Hicks, supra [suspects, though not arrested, lawfully transported in patrol car]; People v Acevedo, supra [defendant transported to and identified at precinct, held, not under arrest].) The test of whether an arrest has occurred is whether or not, in the defendant’s position, a reasonable person innocent of any crime, would have believed he was under arrest. (People v Yukl, 25 NY2d 585, 589 [1969], cert denied 400 US 851 [1970].) No evidence was offered that the suspects were handcuffed* and, while there is no evidence of what they were told about the purpose of the trip, presumedly nothing was said inconsistent with the fact that four of the five were in fact released after the identification procedure had been concluded. (Cf., People v Liner, 133 AD2d 555 [1st Dept 1987].)
The circumstances involved good-faith efforts by the police to sort out — by holding an identification procedure in an orderly and secure atmosphere — who, if any, of the suspects were involved in the shooting and to release any and all who
*586 were not implicated. Absent evidence of additional conduct or talk by the police inconsistent with that purpose, a reasonable, innocent person would not seem to have a substantial basis to believe he was under arrest. While the question is not free of doubt, any doubt would seem properly resolved against the party bearing the burden of proof, in this case defendant. (See, People v Berrios, 28 NY2d 361, 367 [1971].) This is especially true when defendant and the other suspects played a significant part in creating the crowd which had gathered (and the problem thereby presented) by their resolute and prolonged refusal to respond when the police knocked at the apartment door. (See, United States v Sharpe, 470 US 675, 687-689 [1985], supra; People v Harris, 186 AD2d 148 [2d Dept 1992].)
Since defendant was not being unlawfully detained at the time of the identification procedure, then, the rule mandating suppression of evidence which is the "fruit of the poisonous tree”, has no application. (See, Wong Sun v United States, 371 US 471, 488 [1963].) Nor does the evidence support the claim that the identification procedure was in any way suggestive or unfair. And, of course, once defendant had been identified as the gunman by the two witnesses, probable cause existed for his arrest and — simultaneous with the release of the other suspects — he was, in fact, lawfully arrested. (See, People v Berzups, 49 NY2d 417 [1980].)
The evidence also establishes beyond a reasonable doubt that the statement made by him thereafter — while the product of custodial interrogation — occurred after he had been fully informed of his rights pursuant to the teaching of Miranda v Arizona (384 US 436 [1966]), and after a knowing and intelligent waiver of his right to be silent and his right to counsel.

 It is worthy of note, however, that the use of handcuffs — when a suspect is detained on reasonable suspicion in potentially dangerous circumstances— does not, ipso facto, transform detention into an arrest. (See, e.g., People v Allen, 73 NY2d 378 [1989]; People v Chestnut, 51 NY2d 14 [1980]; People v Crowley, 156 AD2d 135 [1st Dept 1989].)